BRADLEY SCHRAGER, ESQ.
Nevada Bar No. 10217
DANIEL BRAVO, ESQ.
Nevada Bar No. 13078
**WOLF, RIFKIN, SHAPIRO,
SCHULMAN & RABKIN, LLP**
3556 East Russell Road, Second Floor
Las Vegas, NV 89120
PH: (702) 341-5200
bschrager@wrslawyers.com
dbravo@wrslawyers.com

*Attorney for Defendant-Intervenors*

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

NEVADA GREEN PARTY; DR. JILL
STEIN; AND JULIA HAMMETT,

              Plaintiffs,

      v.

BARBARA C. CEGAVSKE, in her
official capacity as Secretary of State of
Nevada,

              Defendant.

Case No. 2:16-cv-01951-JAD-CWH

**DEFENDANT-INTERVENORS'
RESPONSE TO PLAINTIFFS'
APPLICATION FOR TEMPORARY
RESTRAINING ORDER AND ORDER
TO SHOW CAUSE RE:
PRELIMINARY INJUNCTION**

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ..................................................................................................... 1

II.  STATEMENT OF FACTS ....................................................................................... 2

    A.  Nevada Provides Multiple Ways by Which a Minor Party Candidate Can Appear on the General Election Ballot ........................................................ 2

    B.  Minor Party Candidate Stein Fails to Satisfy Any of the Alternative Means Nevada Provides to Qualify for the Ballot ................................................. 4

III.  AUTHORITY AND ARGUMENT ......................................................................... 5

    A.  Standards for Temporary Restraining Orders and Preliminary Injunctions ............... 5

    B.  Plaintiffs Are Unlikely to Prevail on the Merits ......................................... 5

        1.  Enforcement of NRS 293.1715 and NRS 293.172 is Not Discretionary ............................................................................... 5

        2.  Plaintiffs Are Unlikely to Prevail on the Merits of Their Claim that NRS 293.1715 and NRS 293.172 are Unconstitutional ................................... 8

            (a)  Ballot Access Provisions Serve a State's Legitimate Interest in Ensuring the Orderly Conduct of Elections and that Only Candidates with Substantial Support Appear on the Ballot ............... 8

            (b)  NRS 293.1715 and NRS 293.172 Plainly Pass Constitutional Muster ........................................................................... 9

            (c)  Plaintiffs Mischaracterizes *Fulani v. Lau* and Her Reliance on It Is Misplaced ............................................................... 12

    C.  Plaintiffs Are Not Likely to Suffer the Kind of Irreparable Harm a Temporary Restraining Order is Designed to Prevent ................................... 13

    D.  A Balance of Equities Does Not Tip in Plaintiffs' Favor And an Injunction Is Not in The Public Interest ...................................................................... 14

IV.  CONCLUSION ...................................................................................................... 16

DEFENDANT-INTERVENORS' RESPONSE TO PLAINTIFFS' APPLICATION FOR TEMPORARY
RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE: PRELIMINARY INJUNCTION

## I.      INTRODUCTION

This case involves an effort by the Nevada Green Party, Dr. Jill Stein, and Julia Hammett ("Plaintiffs") to obtain a court order to excuse their own failure to comply with Nevada's simple, well-established, and entirely lawful ballot access requirements for minor party candidates.

In order to qualify for the general election ballot, a minor party presidential candidate must file a petition with the Nevada Secretary of State that contains a number of signatures equal to one percent of the total number of voters who cast votes in the preceding general election.  The petition must be filed by a statutorily prescribed deadline in June in order to give the State's election officials enough time to determine whether the petition contains the requisite number of valid signatures and for a person aggrieved by that determination to file a subsequent court challenge.  All of this must occur, of course, in ample time to allow the State to finalize and distribute the ballot and for the other candidates for office to know who their opponents will be and to campaign accordingly.

Plaintiff Jill Stein ("Stein"), the Green Party's nominee for President, failed to comply with these rules and, as a result, the Nevada Secretary of State rejected her petition to appear on the general election ballot in November.  Now Stein seeks to litigate her way onto the ballot.  Stein (along with the other Plaintiffs) asks the Court to enjoin the Nevada Secretary of State from following state law by claiming that the Secretary of State's duty to follow the law is "discretionary.  In the alternative, Plaintiffs claim the law is unconstitutional.  Neither of these arguments can withstand scrutiny.  First, the law is clear, unambiguous, and mandatory and does not directly or indirectly give the Secretary of State discretion to ignore the deadlines it imposes.  Second, the law easily passes constitutional muster.  Stripped to its essence, Plaintiffs' challenge to the constitutionality of the signature deadline is nothing more than an attempt to circumvent the fact that the Green Party simply missed the filing deadline due to neglect, lack of voter support, or both.

Plaintiffs' Application for Temporary Restraining Order and Order to Show Cause Re: Preliminary Injunction ("Motion") is unsupported by either fact or law.  Defendant-Intervenors Barbara Hartzell, Denise Gerdes, and Rebecca Grismanauskas respectfully asks the Court to deny it in full.

## II.     STATEMENT OF FACTS

### A.     Nevada Provides Multiple Ways by Which a Minor Party Candidate Can Appear on the General Election Ballot

In Nevada, a presidential candidate from a minor political party can secure a place on the general election ballot in several ways.  NRS 293.1715.  In each instance, Nevada imposes minimum access requirements to ensure that a minor party has a colorable amount of support from Nevada voters before the minor party's candidates can appear on the ballot.

More specifically, there are three ways for minor political party presidential candidates to get on Nevada's general election ballot.  First, at the last preceding general election, the minor political party had a candidate receive at least one percent of the votes cast for the offices of Representative in Congress.  NRS 293.1715(2)(a).  Second, by January 1 preceding a primary election, at least one percent of registered voters in Nevada designated the minor political party as their party on their voter registration applications.  NRS 293.1715(2)(b).  Third, not later than the third Friday in June preceding the general election, the minor political party files a petition with the Secretary of State which is signed by a number of registered voters equal to at least one percent of the total number of votes cast at the last preceding general election for the offices of Representative in Congress.  NRS 293.1715(2)(c). These procedures—and the applicable deadlines—are no secret.  Indeed, Nevada maintains a detailed "Minor Party Election Calendar" to apprise minor parties of relevant election deadlines.  *See* Declaration of Bradley Schrager ("Schrager Decl."), Ex. A.

The instant lawsuit concerns Plaintiffs' admittedly unsuccessful effort to utilize the third of these alternative approaches to qualifying for the ballot.  The signature petition procedure is not onerous.  A minor party candidate must submit a number of signatures equal to at least one percent of the total number of votes cast in the preceding general election.  NRS 293.1715(2)(c).  For the 2016 election cycle, the number of signatures required for a presidential candidate was a mere 5,431.  *See* Motion at 3.  Nevada imposes no further restrictions on the persons who may sign a petition—that is, such petitions may be signed by *any* registered voter, even those who have signed petitions for other minor party candidates or who support a major political party.  *See generally* NRS 293.1715. The deadline to file the petition with the Nevada Secretary of State is "the third Friday in June

DEFENDANT-INTERVENORS' RESPONSE TO PLAINTIFFS' APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE: PRELIMINARY INJUNCTION

1    preceding the general election," which, in 2016, fell on June 17.  *See* NRS 293.1715(2)(c).  Petitions

2    must be submitted to the respective county clerks, however, "10 working days before the last day to file

3    the petition" so that the county clerks can tally the signatures.  NRS 293.172(1)(c); NRS 293.1276.  As

4    a result, in the 2016 election cycle, signatures needed to be submitted to the respective county clerks by

5    June 3, 2016.

6         Submission of the requisite number of signatures to the county clerks is the first step in a

7    lengthy administrative process necessary to validate the submitted signatures in sufficient time to allow

8    ballots to be prepared and voters to be apprised of the candidates among whom they must choose and

9    evaluate their credentials accordingly.  Upon receipt of a petition, each county clerk must tally the

10   number of signatures submitted and forward to the Secretary of State.  NRS 293.1276(1).  The

11   Secretary of State must then determine whether the total number of as-yet unverified signatures

12   exceeds the statutory minimum.  *See* NRS 293.1276(2); NRS 293.1277(1).  If so, the Secretary of State

13   notifies the county clerks, who must then determine the number of registered voters who signed the

14   petition.  *See* NRS 293.1277.  Verification can be a multi-step process.  For example, depending on the

15   results of statistical sampling conducted by the county clerks, the Secretary of State may be required to

16   order the county clerks to re-examine and verify *each* submitted signature individually.  *See generally*

17   NRS 293.1279.

18        The process is not complete once the Secretary of State makes its determination of whether a

19   minor party candidate submitted a sufficient number of signatures.  To the contrary, if the Secretary of

20   State *disqualifies* the petition due to insufficient signatures, the petitioner may appeal the decision and

21   ask the Secretary of State to reconsider it.  NRS 293.12793.  If the Secretary of State reconfirms its

22   earlier determination that the petition is invalid, the petitioner may then appeal to the First Judicial

23   District Court.  NRS 293.12795.

24        The Secretary of State's determination that a petition *is* valid is also subject to challenge.  A

25   person aggrieved by the Secretary of State's determination that a petition contains the requisite number

26   of signatures may file a challenge "not later than 5 p.m. on the fourth Friday in June," with the

27   challenge thereafter set for hearing in the First Judicial District Court.  NRS 293.174.

28   Once the determination is finally made as to which candidates will appear on the ballot, the State's

3

DEFENDANT-INTERVENORS' RESPONSE TO PLAINTIFFS' APPLICATION FOR TEMPORARY
RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE: PRELIMINARY INJUNCTION

election officers must take all steps necessary to finalize the general election ballot.  By statute, no changes to the ballot can be made after the fourth Friday in July.  *See* NRS 293.165(4).  And no later than September 23, 2016, ballots must be distributed to certain overseas and military voters.  *See* NRS 293.309(2)(c).

### B.   Minor Party Candidate Stein Fails to Satisfy Any of the Alternative Means Nevada Provides to Qualify for the Ballot

Stein is the Green Party's presidential candidate.  On June 3, 2016, the Green Party submitted an unidentified number of signatures to place its candidates for President and Vice President on the general election ballot.  *See* Dkt. #3-2 (Borghese Decl.) ¶ 4.  It failed, however, to turn in the requisite number of signatures by the statutorily prescribed deadline.  Motion at 4.  Indeed, Plaintiffs admit that the Green Party did not even *begin* collecting signatures until May 21, 2016—less than *two weeks* before the deadline.   Dkt. #3-2 ¶ 5.   Plaintiffs provide no colorable explanation, rationale, or justification for the Green Party's dilatoriness.  Plaintiffs suggest only that the Green Party has so little support in Nevada that it had great difficulty identifying *any* volunteers willing to gather signatures on its behalf.  *Id.*

On June 22, 2016, the Secretary of State's Office notified the Nevada Green Party that it had failed to submit sufficient verified signatures on its petition.  *Id.* ¶ 4.  On August 1, 2016 (more than 58 days after the deadline had passed), the Green Party attempted to file what it claimed was an additional 1,000 signatures with the Secretary of State.  *Id.* ¶ 7.  In response, the Deputy Secretary of State for Elections informed the Green Party that the Secretary of State's Office would not accept late filings. *Id*.

Plaintiffs' moving papers will be searched in vain for any assertion—let alone evidence—that the Green Party has *now* submitted a sufficient number of signatures by registered voters to qualify its presidential and vice presidential candidates for the ballot.  Moreover, even assuming the Green Party has now submitted the bare minimum number of signatures (as to which there is no evidence), this certainly would not mean that it has submitted a sufficient number of *valid* signatures.  For example, in Georgia this election cycle, the Stein campaign estimated that it submitted "more than 10,000" signatures to meet the judicially-imposed 7,500 signature requirement in Georgia.  Schrager Decl., Ex.

4

B.  Local officials were only able to verify 5,925 signatures on the party's petition, and, as a result, rejected Stein's petition to get on the ballot.  *Id.*  That means, at a minimum, **40 percent** of the signatures submitted by the Stein campaign in Georgia were found to be invalid.

In short, there is no dispute that the Green Party failed to timely submit a sufficient number of valid signatures to qualify for the ballot.  It is undisputed that the statutory deadline for making changes to the general election ballot has passed.  And it is undisputed that Plaintiffs have failed to submit any evidence that Stein will qualify for the ballot if the Court grants the Motion and orders the Secretary of State to verify signatures that the Green Party submitted after the statutory deadline.

III.   **AUTHORITY AND ARGUMENT**

A.     **Standards for Temporary Restraining Orders and Preliminary Injunctions**

In the Ninth Circuit, "[a] plaintiff seeking a preliminary injunction must show that: (1) she is likely to succeed on the merits, (2) she is likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in her favor, and (4) an injunction is in the public interest."  *Farris v. Seabrook*, 677 F.3d 858, 864 (9th Cir. 2012) (citing *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 20 (2008)).

Here, Plaintiffs are not likely to succeed on the merits.  To the contrary, their claim is squarely foreclosed by Nevada election law which, in turn, plainly passes constitutional muster.  Accordingly, neither a temporary restraining order nor a preliminary injunction should be issued.

B.     **Plaintiffs Are Unlikely to Prevail on the Merits**

1.     **Enforcement of NRS 293.1715 and NRS 293.172 is Not Discretionary**

Plaintiffs first argue that the Nevada Secretary of State has "discretion" to disregard mandatory election deadlines imposed by Nevada law (specifically, as embodied in NRS 293.1715 and NRS 293.172).  To put it mildly, this argument badly misses the mark.  It is thus no surprise that Plaintiffs are unable to muster even a single case in support of the proposition that the Secretary of State can unilaterally ignore statutorily mandated election law deadlines.

To the contrary, the plain language of these statutes is clear, unequivocal, and nondiscretionary.  Pursuant to NRS 293.1715(c), "[n]ot later than the third Friday in June preceding the general election, [the minor political party] ***must*** file a petition with the Secretary of State which is signed by a number

5

of registered voters equal to at least 1 percent of the total number of votes cast at the last preceding general election." (emphasis added).  On its face, this statute unambiguously *requires* mandatory compliance and does not grant the Nevada Secretary of State the authority to disregard the statutory deadline.

"It is well established that, when interpreting a statute, the language of a statute should be given its plain meaning." *Nevada State Democratic Party v. Nevada Republican Party*, 256 P.3d 1, 4 (Nev. 2011).  It is equally well established that "[t]he word 'must' generally imposes a mandatory requirement." *Washoe Cty. v. Otto*, 282 P.3d 719, 725 (Nev. 2012); *see also Maison v. Sumner*, 636 F. Supp. 595, 595 (D. Nev. 1986) (referring to "must" as "mandatory language"), *aff'd*, 810 F.2d 205 (9th Cir. 1987).  Nothing in the relevant statutory regime suggests that Nevada intended to set out a specific and detailed procedure for signature verification but to give the Secretary of State carte blanche to ignore that procedure whenever it sees fit to do so.

Furthermore, other jurisdictions have consistently held that statutorily prescribed deadlines pertaining to election laws and ballot access are mandatory and that state officials may not exercise discretion to change them.  *See, e.g.*, *Butts v. Bysiewicz*, 5 A.3d 932, 940 (Conn. 2010) (noting that "it long has been settled in other jurisdictions that statutes employing [definitive words, such as must or shall] in filing deadlines for ballot access are deemed mandatory" and that absent extraordinary circumstances "strict compliance is required such that neither the election official nor the court can excuse a candidate's inadvertent noncompliance"); 26 Am. Jur. 2d Elections § 213 (collecting cases: "Statutory provisions requiring a petition, certificate, or application of nomination to be filed with a specified officer within a stipulated period of time are generally mandatory.  That is, filing requirements, particularly deadlines, will be strictly construed to insure compliance.").[1]

---

[1]    *See also State v. Jeffery*, 170 P.3d 226, 233-34 (Alaska 2007) ("[W]here the election statutes fix a date for filing petitions or certificates of candidacy, such documents must be filed before the expiration of the time fixed, and [the] election officials may not exercise any discretion in the matter."); *Reform Party of Alabama v. Bennett*, 18 F. Supp. 2d 1342, 1355 (M.D. Ala. 1998) (finding that statutory deadline for filing names of minor party candidates was "mandatory" and that "[t]he Secretary of State simply cannot 'administratively' amend or revoke a statute enacted by the Legislature"), *aff'd*, 158 F.3d 1171 (11th Cir. 1998); *Jones v. Mather*, 709 S.W.2d 299, 300 (Tex. App. 1986) ("Statutory requirements concerning candidacy for political office are mandatory.  We must strictly construe the

(footnote continued)

DEFENDANT-INTERVENORS' RESPONSE TO PLAINTIFFS' APPLICATION FOR TEMPORARY
RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE: PRELIMINARY INJUNCTION

1          For example, in *Martin v. Secretary of State*, a judicial candidate in Michigan failed to procure

2    and submit enough signatures to be placed on the ballot by the statutorily imposed deadline after he

3    received incorrect advice from the Secretary of State.  755 N.W.2d 153 (Mich. 2008).  The Supreme

4    Court of Michigan reinstated the decision of the Secretary of State to remove the candidate's name

5    from the ballot "for the reasons stated in the Court of Appeals dissenting opinion[.]"  *Id*. at 154.  In his

6    dissenting opinion at the Court of Appeals, Judge O'Connell wrote:

7              [The Michigan law] clearly indicated the signature requirements for Martin's judicial
             nomination petition, and Martin had a duty to follow them.  Because he did not submit
8            the required number of signatures by the statutory deadline, he should not have been
             given an extra opportunity to be placed on the ballot. Holding otherwise invites the
9            destruction of our citizens' faith in our electoral process.

10   *Martin v. Sec'y of State*, 760 N.W.2d 726, 737-38 (Mich. App.) (O'Connell, P.J., dissenting), *rev'd*,

11   755 N.W.2d 153 (Mich. 2008).

12         Likewise, in *In re Green*, a candidate missed the statutory deadline to file a required form with

13   the designated representative district clerk.  No. 413-7-05, 2006 WL 4959628 (Vt. Sup. Ct. July 27,

14   2006).  The Vermont Superior Court rejected the candidate's subsequent challenge, holding that

15   "[c]ourts may not just ignore deadlines that the Legislature has imposed" and that it had "no authority

16   under [state election law] or its own equitable powers to order the representative district clerk or

17   Secretary of State to act contrary to the mandatory statutory deadline in these circumstances."  *Id*.

18   Here, the governing statute at issue is clear and unambiguous.  It does not give the Nevada Secretary of

19   State discretion to disregard statutorily imposed deadlines.  Intervenors respectfully submit that this

20   Court should not create "ambiguity and inconsistency in what needs to be a uniform and stable area of

21   law" by using its equitable powers to rewrite a clearly written statute to excuse Plaintiffs' admitted

22   failure to comply with the law.  *See Martin*, 760 N.W.2d at 737.

23

24   _____

25   filing deadline to ensure compliance."); *Vandross v. Ellisor*, 347 F. Supp. 197, 207 (D.S.C. 1972)
     ("[S]tatutes . . . which regulate the time for filing a declaration of candidacy are almost universally held
     to be mandatory; and a declaration that is filed too late is a nullity."); *State ex rel. Steams v.*
26   *Zimmerman*, 43 N.W.2d 681, 682 (Wis. 1950) ("[T]he time limit set by the legislature for the filing of
     nomination papers must be strictly observed . . . [T]o enlarge the time which the legislature has
27   designated for the filing of nomination papers would be to amend the statute, not to construe it.").

28

DEFENDANT-INTERVENORS' RESPONSE TO PLAINTIFFS' APPLICATION FOR TEMPORARY
RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE: PRELIMINARY INJUNCTION

2. **Plaintiffs Are Unlikely to Prevail on the Merits of Their Claim that NRS 293.1715 and NRS 293.172 are Unconstitutional**

Plaintiffs next claim that NRS 293.1715 and NRS 293.172 are unconstitutional. This argument fares no better.

(a) **Ballot Access Provisions Serve a State's Legitimate Interest in Ensuring the Orderly Conduct of Elections and that Only Candidates with Substantial Support Appear on the Ballot**

It is well-established that laws restricting ballot access by minor party candidates are constitutional as a general matter. As the Supreme Court has recognized, states have "the undoubted right to require candidates to make a preliminary showing of substantial support in order to qualify for a place on the ballot, because it is both wasteful and confusing to encumber the ballot with the names of frivolous candidates." *Anderson v. Celebrezze*, 460 U.S. 780, 788 n. 9 (1983).

In considering candidate eligibility requirements, however, the courts do assess the potential impact of such laws on "the right of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively." *Id.* at 786-87. "Although these rights of voters are fundamental, not all restrictions imposed by the States on candidates' eligibility for the ballot impose constitutionally-suspect burdens on voters' rights to associate or to choose among candidates." *Id*. at 787. In fact, "as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes." *Id*. (citing *Storer v. Brown*, 415 U.S. 724, 730 (1974)). In this context, the Supreme Court has noted that "the state's important regulatory interests are generally sufficient to justify reasonable, nondiscriminatory restrictions." *Id.*

There is no "'litmus-paper test' to separate valid from invalid restrictions." *Stone v. Bd. of Election Comm'rs for City of Chicago*, 750 F.3d 678, 681 (7th Cir. 2014) (internal citation omitted). Instead, a court must make a "practical assessment of the challenged scheme's justifications and effects":

> [A] court . . . must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate. It then must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule. In passing judgment, the [c]ourt must not only determine the legitimacy and strength of each of those interests; it

8

1    also must consider the extent to which those interests make it necessary to burden the
2    plaintiff's rights. Only after weighing all these factors is the reviewing court in a
     position to decide whether the challenged provision is unconstitutional.

3    *Id.* at 681 (quoting *Anderson*, 460 U.S. at 788).

4         Thus, contrary to the single-minded analysis advanced by Plaintiffs—which focuses *entirely* on

5    the date by which signatures must be submitted under Nevada law, courts applying *Anderson* do not

6    focus *exclusively* on the date on which signatures are due.  Rather, the constitutionality of an election

7    statute "must be determined as a part of the entire scheme regulating ballot access, not in isolation."

8    *See Campbell v. Hull*, 73 F. Supp. 2d 1081, 1089 (D. Ariz. 1999).  In other words, a signature-

9    gathering deadline cannot be analyzed in a vacuum; it must be considered in conjunction with the

10   number of signatures that the statute requires the candidate to gather.  *See Libertarian Party of*

11   *Washington v. Munro*, 31 F.3d 759, 760–61 (9th Cir. 1994) (upholding a Washington statute requiring

12   minor-party candidates to obtain 200 signatures for statewide offices or 25 signatures for other offices

13   by July 4 of the election year); *see also U.S. Taxpayers Party of Florida*, 871 F. Supp. 426, 432, 437

14   (N.D. Fla. 1993) (affirming a July 15th cutoff date with a signature requirement of one percent of the

15   *entire population*, or approximately 60,312 signatures).

16
            **(b)       NRS 293.1715 and NRS 293.172 Plainly Pass Constitutional
17                       Muster**

18        Here, the ballot access regime that Plaintiffs attack serves Nevada's legitimate interests in

19   ensuring that only candidates with substantial support appear on the ballot and that the process for

20   evaluating, verifying, and challenging minor party petitions fits neatly within the State's overall

21   election calendar.

22        Nevada's effective deadline to submit signatures to the county clerks is June 3.  By contrast, the

23   Ohio law at issue in *Anderson* required independent candidates to file petitions signed by thousands of

24   voters in the dead of winter (in Ohio) *eight months* before the general election. 460 U.S. at 782-83.  In

25   those circumstances, the Court found that such an early filing deadline imposed an unconstitutional

26   burden.  *See generally id.*

27        Here, by contrast, Nevada's deadline is 75 days after the deadline in *Anderson*.  Nevada

28   requires only that a minor party candidate obtain a number of signatures equivalent to one percent of

the votes cast in the last general election—a mere 5,431 signatures.  As of June 2016, there were more than *1.5 million registered voters in Nevada*.  *See* Schrager Decl., Ex. C.  It is no great feat to secure this number of signatures for a candidate with actual support in Nevada.  For example, this year, an independent candidate for president, Roque De La Fuente submitted the requisite number of signatures by the appropriate deadline.[2]

Courts routinely reject challenges to laws similar to those at issue here.  For example, in *Jenness v. Fortson*, the United States Supreme Court rejected a challenge to a Georgia statute that required certain candidates to submit petitions signed by five percent of all eligible voters no later than the second Wednesday in June, holding that "there is surely an important state interest in requiring some preliminary showing of a significant modicum of support before printing the name of a political organization's candidate on the ballot—the interest, if no other, in avoiding confusion, deception, and even frustration of the democratic process at the general election."  403 U.S. 431, 432, 442 (1971).

Likewise, in *Woods v. Meadows*, the Fourth Circuit addressed a Virginia ballot access law that required certain independent candidates for public office to file declarations of candidacy and petitions by the second Tuesday in June, approximately five months, or 150 days, before the general election in November.  207 F.3d 708, 709 (4th Cir. 2000).  Such candidates had to submit petitions signed by one-half of one percent of all registered Virginia voters, including at least 200 from each congressional district.  *Id*.  The law was subsequently changed while the case was on appeal to require "candidates to submit 10,000 signatures, including 400 from each congressional district."  *Id*.  The Fourth Circuit had little difficulty in rejecting a challenge to the law, holding that "the burden imposed is both reasonable and nondiscriminatory, particularly when compared with statutes that we and other courts have previously upheld."  *Id*. at 714.  As the Fourth Circuit found, Virginia's stated interests of

---

[2]  *See* Schrager Decl., Ex. D at 1; NRS 298.109.  To appear on the Nevada ballot, an independent candidate for President (*i.e.*, a candidate with no party affiliation) must file a petition that contains a number of signatures equal to one percent of the total number of votes cast at the last preceding general election, which is the same number of signatures required for minor party candidates.  *Compare* NRS 298.109(1) *with* NRS 293.1715(2)(c).  The deadline for independent candidates to file their petitions with the respective county clerks is July 11, 2016.  *See* NRS 298.109 (requiring petitions by independent candidates to be submitted to the respective county clerks "not later than 25 working days before [the second Friday in August]").

DEFENDANT-INTERVENORS' RESPONSE TO PLAINTIFFS' APPLICATION FOR TEMPORARY
RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE: PRELIMINARY INJUNCTION

"administrative convenience" and "limiting the number of candidates on the general election ballot" were legitimate and the June deadline "clearly . . . furthered these interests." *Id*. at 715.  As a result, the Fourth Circuit found no basis for finding the state statutory scheme unconstitutional.  *Id*. at 717.

Numerous other cases are in accord.  *See, e.g.*, *Am. Party of Texas v. White*, 415 U.S. 767, 779 (1974) (requiring submission of signatures equaling 3% or 5% of the vote by June 30); *Libertarian Party of Illinois v. Rednour*, 108 F.3d 768, 775 (7th Cir. 1997) (rejecting claim that a "5% petitioning requirement is severe on its face"); *Stone v. Bd. of Election Comm'rs for City of Chicago*, 750 F.3d 678, 680, 685 (7th Cir. 2014) (upholding law requiring submission of signatures from 12,500 "legal voters of the city" within a 90-day window because "[t]here is no question that the 12,500-signature requirement and accompanying rules 'serve the important, interrelated goals of preventing voter confusion, blocking frivolous candidates from the ballot, and otherwise protecting the integrity of elections.'") (quoting *Navarro v. Neal*, 716 F.3d 425, 431 (7th Cir. 2013)); *Swanson v. Worley*, 490 F.3d 894, 905-06 (11th Cir. 2007) (collecting cases:  "[W]e conclude that Alabama's June filing deadline, in combination with the three-percent signature requirement, does not place a severe burden on the constitutional rights of independent candidates."); *Lawrence v. Blackwell*, 430 F.3d 368, 375 (6th Cir. 2005) (upholding Ohio's filing deadline for independent candidates, which could fall as early as March in presidential election years, with a one-percent signature requirement); *Rainbow Coal. of Okla. v. Okla. State Election Bd.*, 844 F.2d 740, 747 (10th Cir. 1988) (holding that a May 31 filing deadline is not unconstitutional "even in conjunction with the relatively high [five-percent] signature requirement"); *Arizona Green Party v. Bennett*, 20 F. Supp. 3d 740, 742 (D. Ariz. 2014) (rejecting challenge to law requiring Green Party to submit petition with signatures equal to one and one-third percent of the total votes cast for governor in the last general election 180 days before the primary election).

Not only is Plaintiffs' claim unsupported by the law, it is unsupported by the facts.  Indeed, as noted above, Plaintiffs are unable to even *allege* that they have *now* collected and submitted the requisite number of valid signatures.  Moreover, Plaintiffs' terse and conclusory moving papers provide no colorable factual support for their assertion that Nevada imposes any meaningful impediment to minor parties' ability to access the ballot.  Minor party candidates routinely appear on the ballot in

11

Nevada.[3]  The fact that the Green Party could not be bothered to start collecting signatures until less than two weeks before the June 3 deadline (Dkt. #3-2 ¶ 5) does not make that deadline unreasonable.

Thus, when analyzed as whole, a requirement that a candidate gather signatures in a number equal to one percent of voters who cast a vote in the previous election in conjunction with a June 3 deadline is a legitimate exercise of Nevada's power to regulate its electoral process and poses no undue constitutional burdens.

**(c)     Plaintiffs Mischaracterizes *Fulani v. Lau* and Her Reliance on It Is Misplaced**

Faced with all this, Plaintiffs are forced to rely almost entirely on a single, unpublished district court case, *Fulani v. Lau*, No. CV-N-92-535 (D. Nev. Oct. 1, 1992), to justify their claim that a June 3 deadline is unreasonably burdensome.[4]  Unfortunately, Plaintiffs rather badly mischaracterizes the case.

In *Fulani*, the district court considered a predecessor version of Nevada's minor party signature filing deadline that differed markedly from the version the State thereafter adopted.  At the time of *Fulani*, Nevada imposed a *three percent* signature requirement coupled with a June 10th deadline.  The *Fulani* court found that the combination of those two requirements imposed an excessive burden.  *See Campbell*, 73 F. Supp. 2d at 1089.[5]  In their briefing, Plaintiffs conveniently omit the fact that the prior Nevada statute required potential presidential candidates to procure *three times* as many signatures as

---

[3]     Information about past elections and the party affiliation of past candidates is available on the Nevada Secretary of State's website at https://www.nvsos.gov/index.aspx?page=1360 (last visited Aug. 24, 2016).

[4]     The *Fulani* decision is not available online and is no longer on file in the court clerk's office.  *See* Schrager Decl., Ex. E.  Furthermore, Plaintiffs failed to filed a copy of the decision with Plaintiffs' Application as required by LR IA 10-3, which states:  "Cases, statutes, or other legal authority must not be attached as exhibits or made part of an appendix unless they are not accessible on Westlaw or LexisNexis[.]"  Because Defendant-Intervenors have been unable to locate a copy of *Fulani*, it draws the discussion in this response from the description of the *Fulani* decision contained in *Campbell v. Hull*, 73 F. Supp. 2d 1081 (D. Ariz. 1999).

[5]     In *Campbell*, the district court found a state election law to be unconstitutional that required candidates to procure signatures by June 27 equal to 3% of registered Arizona voters at the last election who were not members of a qualified political party.  The court noted, however, that "[p]laintiffs concede that if . . . the restriction on support from major party-affiliated voters, is struck down, the early filing date or the 3% requirement standing alone would not offend the Constitution.").

DEFENDANT-INTERVENORS' RESPONSE TO PLAINTIFFS' APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE: PRELIMINARY INJUNCTION

the current statute.  This is a glaring and informative oversight.  Plaintiffs' reliance on *Nader v. Brewer* is misplaced for similar reasons.  531 F.3d 1028, 1039 (9th Cir. 2008) (overturning an Arizona election law requiring third-party candidates to file petitions containing signatures equal to three percent of registered voters, or 14,694 signatures in 2004, by June 9).  Under the current Nevada law, Plaintiffs were required only to procure 5,431 signatures, which is slightly more than one-third as many signatures as the Arizona law at issue in *Nader*.

      **C.**      **Plaintiffs Are Not Likely to Suffer the Kind of Irreparable Harm a Temporary Restraining Order is Designed to Prevent**

Preliminary injunctive relief is also inappropriate because any "harm" Plaintiffs believe they will suffer is undeniably of their own making.

As discussed above, the pertinent portions of Nevada election law are unambiguously written and constitutional.  The June 3 signature deadline has been on the books for more than a year.[6] Nonetheless, Plaintiffs took no action to collect signatures until shortly before the submission deadline. They then waited another *two months*—until August 1—to submit additional signatures.  *See* Dkt. #3-1 ¶ 4.  And, after the State rejected this plainly untimely submission, Plaintiffs waited *another* two weeks to file the instant motion.

Plaintiffs offer no justification for their lackadaisical approach which, as explained below, prejudices both the State and third parties (such as Defendant-Intervenors) who may wish to file a NRS 293.174 challenge to any potential determination by the State that Plaintiffs have submitted an adequate number of signatures.  Plaintiffs do not claim that the Secretary of State or any other election officials misled them or took any actions that might have caused them to be unable to collect the requisite number of signatures.  Instead, they merely assert that they were unable to collect enough signatures because "finding volunteers interested enough to devote their personal time to collect signatures over five months prior to the general election is an extremely difficult task."  Motion at 3. But, of course, one of the legitimate reasons a State may adopt ballot access requirements in the first

---

[6]   Last year, the signature submission deadline was moved *back* by a month, from May to June.  *See* 2015 Statutes of Nevada, Chapter 525 at 3567 (June 10, 2015).

**DEFENDANT-INTERVENORS' RESPONSE TO PLAINTIFFS' APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE: PRELIMINARY INJUNCTION**

place is to ensure that only candidates who *can* muster some measure of enthusiasm for their candidacies appear on the ballot. *Jenness*, 403 U.S. at 442 ("[T]here is surely an important state interest in requiring some preliminary showing of a significant modicum of support before printing the name of a political organization's candidate on the ballot").

On this factual record, Plaintiffs cannot rest on an emergency of their own making in seeking injunctive relief, and their delay in challenging the statutory provisions in question weighs heavily against its assertion that they will suffer harm in the absence of the requested injunction. *See Utah Gospel Mission v. Salt Lake City Corp.*, 316 F. Supp. 2d 1201, 1221 (D. Utah 2004) ("unnecessary delay in seeking relief 'may be viewed as inconsistent with a claim that . . . in the case of preliminary injunctive relief, that there is an urgent need for immediate relief and that a judgment would be rendered ineffective unless some restraint is imposed on defendant pending an adjudication on the merits'") (quoting 11A Wright, Miller & Kane, Federal Practice and Procedure § 2946 at pp. 113-14 (1995)); *Baer v. Nat'l Bd. of Med. Exam's*, 392 F. Supp. 2d 42, 48-49 (D. Mass. 2005) ("party cannot delay the initiation of litigation and then use an 'emergency' created by its own decisions concerning timing to support a motion for preliminary injunction"); *Gonannies, Inc. v. Goupair.Com, Inc.*, 464 F. Supp. 2d 603, 609 (N.D. Tex. 2006) ("Plaintiffs' delay in seeking a preliminary injunction rebuts any presumption of irreparable harm").

Because any harm suffered by Plaintiffs is of their own making, the Court should not modify the legislature's statutory decree by means of exercising its equitable authority to grant preliminary injunctive relief. *See Green*, 2006 WL 4959628 (refusing to modify statutory deadline where prospective candidate "simply missed a statutory filing deadline due to his own inadvertence").

### D.   A Balance of Equities Does Not Tip in Plaintiffs' Favor And an Injunction Is Not in The Public Interest

Finally, the balance of harms tips sharply against the requested injunction.

As Plaintiffs admit, the Green Party's failure to procure the appropriate number of signatures by the deadline was, at least in part, due to the fact that it failed to start collecting signatures until less than two weeks before the deadline. Plaintiffs' desire to be given more time than other third-party or independent candidates to gather signatures does not outweigh the public's interest in the fair, equitable

1 conduct of elections.

2       Indeed, the public has strong reliance interests in the orderly administration of the upcoming

3 election that would be up-ended should the Court intervene at this late date.  The deadline for mailing

4 absentee ballots to overseas voters is less than a month away, on September 23.  *See* 52 U.S.C. §

5 20302(a)(8) (generally requiring states to transmit absentee ballots to absent uniformed services or

6 overseas voters not later than 45 days before the election).  Courts have frequently denied equitable

7 relief where a request for a stay/injunction was filed too close to an election:  "[L]ast-minute

8 injunctions changing election procedures are strongly disfavored."  *Serv. Employees Int'l Union Local*

9 *1 v. Husted*, 698 F.3d 341, 345 (6th Cir. 2012).[7]

10       Plaintiffs did not act promptly here, and Intervenor, the State's election administration, and the

11 public at large all have strong reliance interests at stake.  For all of these reasons, Plaintiffs' belated

12 motion for preliminary injunctive relief should be denied.

13       Stripped to its essence, Plaintiffs ask the Court to create an equitable remedy for a hardship

14 created by an "unambiguous, validly enacted, legislative decree."  *See Martin*, 760 N.W.2d at 737

15 (internal quotation marks omitted).  To grant that request, however, "invites the destruction of our

16 citizens' faith in our electoral process."  *Id.* at 738.

17 / / /

18 / / /

19 / / /

20 / / /

21 / / /

22 / / /

23 / / /

24

25    [7]  *See also Purcell v. Gonzalez*, 549 U.S. 1, 5-6 (2006) ("[Conflicting] [c]ourt orders affecting
elections . . . can themselves result in voter confusion and consequent incentive to remain away from

26 the polls."); *Md. Citizens for a Representative General Assembly v. Governor of Md.*, 429 F.2d 606,
610 (4th Cir. 1970) (denying injunction three months before candidate filing deadline, citing the

27 "disruption upon potential candidates, the electorate and the elective process").

28

DEFENDANT-INTERVENORS' RESPONSE TO PLAINTIFFS' APPLICATION FOR TEMPORARY
RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE: PRELIMINARY INJUNCTION

## IV.   CONCLUSION

Plaintiffs failed to comply with Nevada's constitutional mandate to submit the Green Party's ballot petition with the requisite number of signatures by June 3, 2016.  As a result, the Nevada Secretary of State complied with Nevada law when it denied Stein's petition to be placed on the ballot. The law is constitutional and must be enforced.  As a result, Plaintiffs' Application for a Temporary Restraining Order and Order to Show Cause Regarding Preliminary Injunction should be denied.

DATED this 25th day of August, 2016.

**WOLF, RIFKIN, SHAPIRO,**
**SCHULMAN & RABKIN, LLP**


By:   */s/ Bradley Schrager*
BRADLEY SCHRAGER, ESQ.
Nevada State Bar No. 10217
DANIEL BRAVO, ESQ.
Nevada State Bar No. 13078
3556 E. Russell Road, Second Floor
Las Vegas, Nevada 89120

*Attorneys forDefendant-Intervenors*

DEFENDANT-INTERVENORS' RESPONSE TO PLAINTIFFS' APPLICATION FOR TEMPORARY
RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE: PRELIMINARY INJUNCTION

1

**CERTIFICATE OF SERVICE**

2          On August 25, 2016, I caused to be served upon counsel of record, at the address stated below,

3   via the method of service indicated, a true and correct copy of the following document:

4
5   **DEFENDANT-INTERVENORS' RESPONSE TO PLAINTIFFS' APPLICATION FOR
    TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE:
    PRELIMINARY INJUNCTION**

6

7   Tony Nasser                                        ____   Via Hand Delivery
    Barnes Law                                         ____   Via U.S. Mail, 1st Class, Postage
8   601 South Figueroa Street, Suite 4050                     Prepaid,  and U.S. Mail, Certified,
    Los Angeles, California 90017                             Return Requested
9   Telephone: (310) 510-6211                          ____   Via Overnight Delivery
    Facsimile: (310) 510-6225                         __X__   Via E-Filing
10

11
    Mace J. Yampolsky                                  ____   Via Hand Delivery
12  Mace J. Yampolsky, Ltd.                            ____   Via U.S. Mail, 1st Class, Postage
    625 South Sixth Street                                    Prepaid,  and U.S. Mail, Certified,
13  Las Vegas, Nevada 89101                                   Return Requested
    Telephone: (702) 385-9777                          ____   Via Overnight Delivery
14  Facsimile: (702) 385-3001                         __X__   Via E-Filing

15

16  Barbara C Cegavske                                 ____   Via Hand Delivery
    Nevada State Capital Building                      ____   Via U.S. Mail, 1st Class, Postage
17  101 North Carson Street, Suite 3                          Prepaid,  and U.S. Mail, Certified,
    Carson City, Nevada 89701                                 Return Requested
18  Telephone: (775) 684-5708                          ____   Via Overnight Delivery
    Facsimile: (775) 684-5725                         __X__   Via E-Filing
19  E-mail: LStory@ag.nv.gov                          __X__   Via E-Mail

20

21
            I certify under penalty of perjury under the laws of the State of Nevada that the foregoing is
22
    true and correct.
23
            DATED this 25th day of August, 2016.
24
                                            By:   _/s/ Dannielle Fresquez_____
25                                                 Dannielle Fresquez, an Employee of
                                                   WOLF, RIFKIN, SHAPIRO, SCHULMAN &
26                                                 RABKIN, LLP

27

28

DEFENDANT-INTERVENORS' RESPONSE TO PLAINTIFFS' APPLICATION FOR TEMPORARY
RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE: PRELIMINARY INJUNCTION