ADAM PAUL LAXALT
Attorney General
LORI M STORY
Senior Deputy Attorney General
Nevada Bar Number 6835
100 North Carson Street
Carson City, Nevada 89701
(775) 684-1114
lstory@ag.nv.gov
*Attorneys for Defendant Secretary of State*

# IN THE UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

| | |
|---|---|
| THE NEVADA GREEN PARTY OF NEVADA, DR. JILL STEIN; AND JULIA HAMMETT, <br><br> Plaintiffs, <br><br> v. <br><br> BARBARA CEGAVSKE, in her official capacity as Nevada Secretary of State, <br><br> Defendant. | Case No.:  2:16-cv-01951-JAD-CWH <br><br> **DEFENDANT'S OPPOSITION TO APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE: PRELIMINARY INJUNCTION** |

Defendant BARBARA K. CEGAVSKE, Secretary of State, by and through counsel, ADAM PAUL LAXALT, Attorney General, and LORI M STORY, hereby opposes Plaintiffs' Application for Temporary Restraining Order and Order to Show Cause Re: Preliminary Injunction (Application).  The opposition is made pursuant to FRCP 65 and based upon the following memorandum of points and authorities together with all attached exhibits and all pleadings and papers on filed herein.

## MEMORANDUM OF POINTS AND AUTHORITIES

I. Factual Background

a. 2014 Lawsuit

In April 2014, Plaintiffs filed a complaint for Injunctive and Declaratory Relief challenging the purportedly unconstitutional deadline for minor political parties to

Attorney General's Office
100 North Carson Street
Carson City, NV  89701

1  submit their petitions to place their presidential candidates on the general election ballot,

2  claiming the Green Party was unable to obtain the required number of valid signatures in

3  time to meeting the filing deadline then set for the third Friday in May.  That case was

4  entitled The Green Party of Nevada, et al. v. Ross Miller in his official capacity as Nevada

5  Secretary of State and was filed as case number 3L14-cv-00210-LRH-WGC.  Exhibit (Ex.)

6  1, Complaint filed in this court in case number 3:14-cv-00320, Dkt. #1. During the

7  pendency of that civil action, the Nevada Legislature was about to go into session and the

8  parties agreed to stay the matter to allow the Legislature to consider a revision to "the

9  relevant statutes [which] may resolve the primary issues in [that] case." Ex. 2, 3:14-cv-

10  0210, Dkt. 23. By the end of the legislative session, NRS 293.1715 and 293.172 were

11  revised to lengthen the time allowed for the collection of signatures on the petition to

12  qualify as a minor party in the state. *See* Ex. 3, Senate Bill (SB) 499.

13  Prior to the enactment of SB 499, and at the time the 2014 complaint was filed,

14  Nevada law required minor party qualifying petitions to be filed with the Secretary of

15  State no later than the third Friday in May (2011 Statutes of Nevada, page 3278; NRS

16  293.1715(2)(c) (2011)) and required that the signatures be submitted to the local county

17  election official for verification no later than "25 working days before the last day to file

18  the petition". 2011 Statutes of Nevada, page 3277; NRS 293.172(1)(c) (2011).  SB 499

19  changed the deadline for filing the petition with the Secretary of State to the third Friday

20  in June and required the signatures be submitted for verification not later than 10 days

21  before the deadline for filing the petition with the Secretary of State.  *See* Ex. 3,

22  Legislative Digest.

23  Based upon this legislation, the parties to the 2014 civil action stipulated that "in

24  view of this enactment, no case or controversy remains in this litigation" and agreed to

25  dismiss the action.  Ex. 4. The Court entered its order approving the stipulation on July

26  10, 2015. *Id.*

27  / / /

28  / / /

Attorney General's Office
100 North Carson Street
Carson City, NV  89701

b. <u>Post-Dismissal of 2014 Lawsuit</u>

On March 14, 2016, Plaintiffs pre-filed their Minor Political Party Ballot petition with the Secretary of State, clearly indicating that they intended at that point to attempt to qualify for the ballot.  Ex. 5, Minor Political Party Ballot Access Petition. Two months later, according to their complaint, they began circulating the petition and gathering signatures. Dkt. # 1, at p. 3.   On June 3, 2016, they submitted their petitions for verification of signatures in Carson City, Churchill, Douglas, Elko Lyon, Storey, Washoe and Clark counties. Affidavit of Wayne Thorley, ¶ 6.  When the verification process was complete, Plaintiffs had 92 of 119 valid signatures in Carson, 2 of 4 in Churchill, 14 of 19 in Douglas, 16/22 in Elko, 20 of 34 in Lyon, 7 of 9 in Storey, 215 of 236 in Washoe and only 4418 of 8111 in Clark County.  *Id*.  After appealing the verification process in Clark County, as provided in NRS 293.12793 (Ex. 6), which appeal was denied on August 12, 2016 (Ex. 7), Plaintiffs filed this lawsuit and application for TRO.

Exactly as in the 2014 complaint, in the instant complaint brought pursuant to 42 U.S.C. § 1983, Plaintiffs contend that the statutory deadlines are unconstitutional because they violate the First and Fourteenth Amendments to the United States Constitution by interfering with their free speech and free- association rights.  Just as they did in 2014, and despite the delayed petition filing deadline which Plaintiffs felt adequately addressed their concerns in July of 2015, Plaintiffs again complain that the filing deadline is unconstitutionally burdensome because Plaintiff found it difficult to obtain volunteers to collect signatures. In fact, the complaint acknowledges that Plaintiffs did not begin to circulate petitions in Nevada until May 21, 2016, leaving them less than two weeks to gather the required 1% of total votes cast at the last preceding general election – for this election, 5,431 signatures, despite having pre-filed the petition with the Secretary of State more than two months prior. NRS 293.1715(2)(c).

/ / /

/ / /

/ / /

Attorney General's Office
100 North Carson Street
Carson City, NV   89701

Plaintiffs assert that the Secretary of State has discretion to extend the filing deadlines and to accept additional signatures that were gathered after the original petitions proved inadequate as to the number of actual qualified signatures.[1]  Plaintiffs seek a Temporary Restraining Order requiring the Secretary of State to take all actions necessary to accept the Party's petition to place its candidates on the general election ballot for all counties in Nevada or, alternatively, an order prohibiting the Secretary of State and anyone acting in active concert with her from enforcing "an unconstitutional petition deadline" of June 3, 2016.

II. <u>Legal Standard for Temporary Restraining Order and Preliminary Injunction</u>

In order to obtain a temporary restraining order and preliminary injunction, Plaintiffs must demonstrate through specific facts that immediate and irreparable injury, loss, or damage will result before the adverse party's opposition to a motion for preliminary injunction can be heard. Fed.R.Civ.P. 65.  The purpose of a temporary restraining order is to preserve the status quo before a preliminary injunction hearing may be held; its provisional remedial nature is designed merely to prevent irreparable loss of rights prior to judgment." *Sierra On–Line, Inc. v. Phoenix Software, Inc.,* 739 F.2d 1415, 1422 (9th Cir.1984).  In seeking a temporary restraining order, the movant must demonstrate that the denial of relief will expose him to some significant risk of irreparable injury. *Associated Gen. Contractors of Cal. v. Coalition of Econ. Equity,* 950 F.2d 1401, 1410 (9th Cir.1991).

Courts must consider the following elements in determining whether to issue a temporary restraining order and preliminary injunction: (1) a likelihood of success on the merits; (2) likelihood of irreparable injury if preliminary relief is not granted; (3) balance of hardships; and (4) advancement of the public interest. *Winter v. N.R.D.C.,* 555 U.S. 7, 20 (2008). Because the elements are conjunctive, the party seeking the injunction must satisfy each element.

---

[1] They cite to no statutory provision which specifically provides that discretion and Defendant finds no such authority in Nevada law.

Attorney General's Office
100 North Carson Street
Carson City, NV  89701

1    III. Argument

2        a.    Likelihood of Success on the Merits

3        "Voting is of the most fundamental significance under our constitutional

4    structure." *Illinois Bd. of Elections v. Socialist Workers Party,* 440 U.S. 173, 184, 99 S.Ct.

5    983, 990, 59 L.Ed.2d 230 (1979).  Despite this truth, the right to vote in any manner and

6    the right to associate for political purposes through the ballot are not absolute.  *Munro v.*

7    *Socialist Workers Party,* 479 U.S. 189, 193, 107 S.Ct. 533, 536 (1986).  The Constitution

8    provides that States may prescribe certain framework for the exercise of this right,

9    including "prescribe[ing] the Times, Places and Manner of holding Elections."    U.S.

10   Const., art. I,

11   § 4, cl. 1.  Under this Constitutional provision, states retain the power to regulate their

12   own elections. *Sugarman v. Dougall,* 413 U.S. 634, 647, 93 S.Ct. 2842, 2850 (1973);

13   *Tashjian v. Republican Party of Connecticut,* 479 U.S. 208, 217, 107 S.Ct. 544, 550 (1986).

14   While a fundament right is implicated, strict scrutiny of such regulation is impractical

15   and would "tie the hands of the States seeking to assure that elections are operated

16   equitably and efficiently." *Burdick v. Takushi,* 504 U.S. 428, 433–34, 112 S. Ct. 2059,

17   2063–64 (1992); *see also Anderson v. Celebrezze,* 460 U.S. 780, 788, 103 S.Ct. 1564, 1569–

18   1570 (1983). Thus, to resolve a challenge to the constitutionality of a State's election laws,

19   a court

20                   …must first consider the character and magnitude of the
                     asserted injury to the rights protected by the First and
21                   Fourteenth Amendments that the plaintiff seeks to vindicate. It
                     then must identify and evaluate the precise interests put
22                   forward by the State as justifications for the burden imposed by
                     its rule. In passing judgment, the Court must not only
23                   determine the legitimacy and strength of each of those interests;
                     it also must consider the extent to which those interests make it
24                   necessary to burden the plaintiff's rights.

25   *Anderson*, 460 U.S. at 789, 103 S. Ct. 1564, 1570.

26       A State's interest must be "sufficient weighty" to justify ballot restrictions that

27   limit a candidate's or a new party's access to the ballot. *Id.* Generally applicable, even-

28   handed restrictions designed to protect the integrity and reliability of the election process,

*Attorney General's Office*
*100 North Carson Street*
*Carson City, NV  89701*

Attorney General's Office
100 North Carson Street
Carson City, NV  89701

such as requiring a showing of substantial support for a candidate to qualify for a place on the ballot, are considered reasonable restrictions designed to avoid waste and confusion on the ballot. *Jenness v. Fortson*, 403 U.S. 431, 91 S.Ct. 1970 (1971) (State has a related interest in protecting the integrity of the political process from frivolous and fraudulent candidacies.); *American Party of Texas v. White*, 415 U.S. 767, 94 S. Ct. 1296 (1974); *cf. Storer v. Brown*, 415 U.S. 724, 738–746, 94 S.Ct. 1274, 1283–1286 (1974) (State has an interest in the stability of the political system.) The Supreme Court has also recognized "that the State's interest in keeping its ballots within manageably understandable limits is of the highest order." *Bullock v. Carter*, 405 U.S. 134, 144-145, 92 S.Ct. 849, 856 (1972).  Ensuring accurate and error-free elections by allowing adequate time for election officials to properly prepare, translate, review, proof and print ballots in order to meet federally mandated deadlines for release of absentee/mail ballots such as are imposed by the Uniformed and Overseas Citizens Absentee Voting Act, are also extremely important governmental interests. *See* 52 U.S.C. § 20301, *et seq.*  As discussed below, preparing for an election, including the preparation and testing of 1,116 different ballot versions, is and expensive and time consuming endeavor that require careful execution.

In determining whether a challenged law unfairly or unnecessarily burdens the First Amendment rights of the Plaintiffs, the Court should focus on whether a "reasonably diligent candidate can be expected to satisfy the signature requirement." *Storer v.* Brown, 415 U.S. at 742, 94 S.Ct 1274, 1285.  To establish this criterion courts should consider whether other independent or minor party candidates have succeeded in qualifying for the ballot.  *Id.* In this presidential election, the ballot will include candidates from the two major parties as well as candidates from the Libertarian Party and the Independent Americans party.  Thorley Aff. ¶ 8.  In 2014 and in 2012, candidates from the Independent American Party and the Libertarian Party were on the ballot.  *Id.* Thus, it appears that the state law requirements for qualifying candidates from minor

Attorney General's Office
100 North Carson Street
Carson City, NV  89701

political parties can and have been met in Nevada, even under the more stringent requirements of the 2011 statute.

Plaintiffs claim that the ten-working-days verification process allowed before the June 17, 2016, filing deadline, together with the county's rejection of the late offered additional signatures, deny them and their supporters the opportunity to vote for a candidate of their choosing, violating their fundamental right to free political speech and association through ballot access.   Based on the facts surrounding this claim, the argument should not persuade the Court.

Plaintiffs had planned to circulate a petition as early as March 14, 2016, as evidenced by the pre-filing of the petition (Ex. 6), but delayed gathering signatures until late May. Dkt. #1, p. 3. Even so, Plaintiffs were able to collect and submit 8,111 signatures in Clark County alone.  Of that number, 2,764 were disqualified as not being registered voters. Thorley Aff., ¶ 7.  A majority of the others were disqualified as being duplicate signatures (247) or because they were illegible (116) or because the signature did not match the signature in the voting records (511).  *Id.*

Plaintiffs' suggestion that they should not be held responsible for the late start they made in collecting signatures simply because it can be difficult to engage volunteers to collect signatures before the interest in the election becomes heightened, should also be discounted.   Given that the statewide total of signature needed to qualify for the ballot is 5,431, if the workers that the Plaintiff engaged had worked more diligently to ensure that the signors were registered voters, those signatures would have been verified and Plaintiffs could have qualified for the ballot.  As established by the 2014 lawsuit and the subsequent 2015 voluntary dismissal of that action, Plaintiffs were fully aware of the statutory requirements in place for the 2016 election and apparently accepted them as valid and viable. Ex. 5. Moreover, there is nothing in Nevada law that limits when a group can begin to collect signatures to qualify their candidate for the ballot. *See generally*, NRS 293.171-293.174.  Thus, had the Plaintiffs started gathering signatures

Attorney General's Office
100 North Carson Street
Carson City, NV  89701

1  even a couple of weeks earlier, they could have easily collected additional verifiable
2  signatures and still met the filing deadline.

3       In formulating the procedures for nominating candidates from minor parties, the
4  State protects its important interest in maintaining the integrity of the ballot and in
5  avoiding confusion to voters by requiring a showing of significant voter interest in the
6  candidates.  Nevada law requires a showing of 1% of the voters at the last general election
7  for Congressional Representatives.    NRS 293.1715(2)(c).  The State has a further
8  important interest in ensuring that the candidate support represented by the petitions is
9  from valid registered voters who can and will cast their ballot in support of the candidate
10  they seek to nominate and not the result of manipulation or interference from non-
11  residents or disinterested persons.  *Id.* The State has an important interest and
12  responsibility to protect and promote fiscal reasonableness in conducting elections.
13  Unwarranted delays in moving the ballot preparation process forward leads to
14  exponential increases in state expenditures. Affidavit of Joseph Gloria (Gloria Aff.), ¶ 5.
15  Procedures and reasonable timelines for performing the necessary signature validation
16  before the date by which ballots must be ready for circulation promotes and protect those
17  interests.  *Id.*, at ¶ 10, Thorley Aff., ¶ 3.

18       *Fulani v. Lau*, the unpublished case from this district upon which Plaintiffs rely,
19  can be distinguished from the facts of this case. In 1992, Fulani objected to and Judge
20  Reed considered the 65-day period allowed to the county clerks to verify the petition
21  signatures submitted by Fulani to be unnecessarily and unjustifiably long, impacting the
22  plaintiff's and her supporters' constitutional rights.  *Fulani v. Lau*, No. CV-N-92-535-
23  ECR.  Today, the time for signature verification has been shorted to only 10 days.  It is
24  the federally mandated UOCAVA requirement that mail/absentee ballots be ready 45-
25  days before the general election – September 23, 2016, for this election -- that creates the
26  need for early submission and verification, leaving only 91 days during which the ballots
27  must be created, translated, proofed, printed, published, and tested with the voting
28  equipment.  This federally imposed deadline was not in effect until 2010 with the passage

Attorney General's Office
100 North Carson Street
Carson City, NV  89701

1    of the Military Overseas Voter Empowerment (MOVE) Act (H.R. 2647, Pub.L. 111-84, 123

2    Stat. 2190), which amended UOCAVA.

3         The other rationale considered by the District Court in *Fulani* would not apply to

4    the facts of this case.  For instance, Judge Reed found that the long deadline burdened

5    "newly emerging political movements or parties." *Fulani,* at 9.  Here, the Green Party is

6    a small, but nationally known political party which has been in existence since 1984.

7    *Green Party US, History*; http://www.gp.org/history.  Moreover, the Green Party knew

8    well in advance of the time they actually started to collect signatures that they were

9    hoping to place a candidate on the ballot in Nevada and that the political landscape

10   related to presidential candidates in particular, was rapidly changing and might invite

11   strong interest in a third-party candidate. Ex. 5. In January of 2016, there were 17

12   candidates for the Republican Party Presidential nomination.  Carl Bialik, *How the*

13   *Republican Field Dwindled from 17 to Donald Trump*, FiveThirtyEight.com, May 5, 2016,

14   http://fivethirtyeight.com/features/how-the-republican-field-dwindled-from-17-to-donald-

15   trump.  However, by March 4, 2016, all of those candidates except Donald Trump, John

16   Kasich, and Ted Cruz had exited the race. *Id.* By May 4, Trump was the presumptive

17   nominee.  *Id.*  These facts militate against any claim that the Green Party came late to

18   the party.  Neither is the Green Party a newcomer to the political landscape, having been

19   in existence for three decades and having run a national ticket in every presidential

20   election since 1996.  *Green Party US, History*; http://www.gp.org/history.  Thus, Judge

21   Reed's rational in *Fulani* related to last minute decisions to run a candidate is not

22   applicable here.

23        The *Fulani* decision also considered the difficulties in attracting volunteers and

24   collecting signatures "long before the general population has begun to think about the

25   elections season," quoting *Anderson. Fulani*, p.10.  The above paragraph identifies the

26   dwindling list of GOP candidates, most of which occurred shortly before the Plaintiffs pre-

27   filed their petition with the Secretary of State.  Arguably, a slightly more sincere effort on

28   the part of this long-standing minor political party could have rustled up sufficient

Attorney General's Office
100 North Carson Street
Carson City, NV  89701

1  volunteers to circulate petitions in early rather than the end of May, two weeks before

2  they were due to be filed.  Moreover, the requirements imposed in 1992 on minor parties

3  and considered by the *Fulani* court also included obtaining signatures of "at least 3% of

4  the total number of votes cast at the last preceding general election for Representative in

5  Congress."  NRS 293.1715(6)(c), 1989 Statutes of Nevada, p. 2161.  Today, the candidate

6  need obtain only 1% of the votes cast at the last general election for the offices of

7  Representatives in Congress. NRS 293.1715(2)(c).

8      Plaintiffs do not demonstrate with any evidence what efforts they took to secure

9  volunteers between March 24, 2016, when they filed their petition and May 21, 2016,

10 when they assert they actually began to collect signatures.  Thus, the Court should not

11 assume that there were such efforts made.  Given the evidence provided by Plaintiffs, the

12 Court should conclude that Plaintiffs did not effectively use the time available to them to

13 gather signatures to support their candidates' nomination.  Such inefficiency does not

14 invalidate reasonable state timelines imposed to further important state interests.

15      Finally, the Fulani court considered whether any other minor party candidates had

16 been able to qualify for the ballot under the restrictions imposed by the statute.  *Fulani*, o.

17 9.  According to State records, there have been Libertarian and Independent American

18 Party candidates on the Nevada ballots in 2012 and 2014.  Thorley Aff. ¶ 8.  Accordingly,

19 Plaintiffs' claim of unconstitutional time constraints in qualifying for ballot access should

20 be denied. They are unlikely to prevail on the merits of their claim.

21      Moreover, granting the requested relief to allow Plaintiffs to continue gathering

22 signatures offers no guarantee that the candidates will qualify to appear on the ballot if

23 the additional signatures are not sufficient to meet the required 1% of voters from the last

24 general election or a total of 5,431.  At the time the original set of signatures was verified,

25 Plaintiffs submitted a total of 8,111 signatures for verification in Clark County. Thorley

26 Aff., ¶ 7.  Of those, a total of 3,693 were declared invalid, with the majority (2,764)

27 rejected as unregistered voters. *Id.*; Ex. 5, Appeal by the Nevada Green Party Contesting

28 Clark County's Verification of Signatures, p. 10.  The valid signatures submitted in seven

other counties totaled 366. Thus, Plaintiffs would need to obtain and validate an additional 647 signatures to qualify as a minor party nominee.

According to their complaint, they attempted to submit "over 1000 signatures" in support of the ballot access petition, but those signatures were rejected as untimely. Because only 55.9% of the total signatures originally submitted were valid, to meet the required additional 647 valid signatures to qualify, the percentage of validation of those 1000 signatures would have to increase to 65%. While possible, it is not likely.

b. <u>Balance of Hardship</u>

Plaintiffs assert that Defendant will suffer no harm if this TRO is granted and the county election officials are required to verify additional signatures and thereafter publish ballots containing the name of the Green Party candidates for president. This assertion could not be further from the truth. Under Nevada law, each county prepares, proofs, prints, and publishes their own ballots after being given information from the Secretary of State related to all state-wide contests and questions. *See generally NRS* Chapter 293. The ballots vary from county to county and over voting precincts within counties. Using Clark County as an example, due to its large size and population, the following facts emerge to establish that severe hardship will arise to the State and the counties if the TRO is granted and the completion of the ballot preparation process is delayed for even a few days.

The Clark County Registrar of Voters is responsible for the printing and mailing the mail/absentee ballots and sample ballots, as well as the preparation of all voting equipment used by the voters in Clark County. Gloria Aff., ¶ 2. The federal deadline for delivering mail/absentee ballots under the federal Uniformed and Overseas Citizens Absentee Voting Act (UOCAVA) for this general election is September 23, 2016. *Id.*

Printing, proofing, and preparing mail/absentee ballots require a substantial amount of time to insure accuracy. Gloria Aff. at ¶ 3. Because Nevada statutes require the counties report election results by precinct, Clark County mail/absentee ballots are prepared by precinct. *Id.* There are 1,116 separate precincts each requiring a separate

Attorney General's Office
100 North Carson Street
Carson City, NV  89701

printed ballot version and requiring each ballot to be individually numbered. *Id.* Preparation for printing takes four to five days of work to setup the files and proof the data for accuracy. *Id.* After printing, the ballots are trimmed, folded, and tracked for any damage from the production process that may require reprinting to meet the necessary order quantities for the election. *Id.* Finally, each mail/absentee ballot and voting instructions are mechanically inserted into an envelope. *Id.*

Once the mail/absentee ballots are printed and delivered to the Clark County Election Center, the ballots must be sorted into 1,116 different, applicable trays, inventoried, and randomly proofed to ensure the appropriate ballot versions are in the proper envelopes. Gloria Aff., ¶4. This process normally finishes three days after the last delivery of ballots. *Id.*

Nevada Color Lithe (NCL) is the printer used by Clark County and it is the only printer in the state of Nevada certified to print mail/absentee ballots. Gloria Aff., ¶ 5. NCL's normally runs production 12 to 18 hours per day, 5 to 6 days per week. *Id.* If Clark County require rush mode printing, NCI works around the clock, everyday including holidays. *Id.* Rush mode requires the printer to set aside other work to focus exclusively on ballot production. *Id.* When this happens, internal overtime increases, outsourcing and all of its associated costs increases, and additional temporary staff must be hired, increasing NCL job costs by 2% to 10% of the total printing cost per day, depending upon how compressed the schedule is and the extent of additional resources that must be devoted to printing our material. *Id.*

UOCAVA and NRS 293D.320(1) mandate that mail/absentee ballots must be mailed to military and overseas voters not later than 45 days before the date of the General Election. Gloria Aff., ¶ 6. For the upcoming November 8, 2016, General Election, that date is September 24, 2016. *Id.* To allow the Clark County Election Department adequate time to inventory, sort, and quality control the mail/absentee ballots we receive from NCL, the delivery of these ballots must be no later than September 16, 2016. *Id.* As a result, August 25, 2016 is the last date for the Clark County Election Department to

Attorney General's Office
100 North Carson Street
Carson City, NV 89701

Attorney General's Office
100 North Carson Street
Carson City, NV  89701

1  provide the mail/absentee ballot files to NCL for normal production mode printing in

2  order to ensure delivery of all mail/absentee ballots to the Election Center by September

3  16, 2016. *Id.* at ¶ 7.

4       After August 25, costs begin increasing until they reach the maximum rush mode

5  rate on September 1. Gloria Aff. ¶ 7.  After September 1, NCL <u>cannot</u> meet the September

6  16 deadline, even in rush mode.  *Id.*  Each additional day after September 1 that NCL

7  does not receive the mail/absentee ballot files extends the delivery date another day

8  beyond September 16. *Id.* Although we will do all we can to expedite processing of

9  overseas ballots, each day after September 1 equates to a day subtracted from the state

10 and federal requirements to mail overseas ballots 45 days before Election Day. *Id.*; 52

11 U.S.C. § 20302(a)(8)(A).

12      Clark County Election Department is responsible for support of the entire election

13 process including the printing and mailing of up to 1,000,000 sample ballot booklets that

14 contain, among other things, all state and federal contests, ballot questions,

15 corresponding explanations, and arguments for and against passage. Gloria Aff., ¶ 9. For

16 early voting and Election Day voting, we must program, proof and conduct statutorily

17 required pre-election logic and accuracy testing for approximately 4,500 voting machines

18 that contain ballot questions and contests. *Id.* Every day of delay increasingly compresses

19 the preparation schedule and that in turn increases potential errors that could affect the

20 election outcome.  *Id.* The county clerks and registrars do everything possible to achieve

21 an error-free election, but the reality is that a 24-hour schedule and corresponding

22 reduction in time available for quality control will increase the potential for error. *Id.*

23 Given the size of Clark County, conducting a successful election has become incredibly

24 complex and adequate preparation time is critical to the registrar's ability to provide

25 residents with the high-quality, professional elections they deserve and expect. *Id.*

26 Missing the timelines outlined above will result in a minimum cost increase of $100,000

27 to Clark County alone. *Id.* at ¶ 8.

28

Attorney General's Office
100 North Carson Street
Carson City, NV  89701

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Accepting after-the-deadline petitions for minor party candidates will require that the entire set of signature be re-verified together, because our system does not allow add-on signatures after the verification process has begun.  Gloria Aff., ¶ 10.  It took Clark County six days to verify the signatures on the petitions originally submitted by the Nevada Green Party. *Id.* Adding an additional 1000 signatures (or more) will increase the verification time by two days. *Id.*  If the signatures are verifiable, allowing the Nevada Green Party candidate to qualify for the ballot, ballot preparation for all 1116 voter precincts will need to begin over again for all election tally types, to include mail ballot, early voting, and Election Day. *Id.* This delay would make it impossible for Clark County to meet the federal deadline for delivery of overseas ballots and it will jeopardize the county's ability to have machines prepared in time for the early voting period.  *Id.*

As the foregoing demonstrates, election officials and the citizens of the State of Nevada will be faced with severe hardships in both time and money if the Court grants the requested TRO and requires Clark County and any other counties to accept and verify additional signatures from Plaintiffs. In fact, requiring such a process will completely jeopardize the State's ability to comply with federal overseas voter requirements and presents a very real increase in potential for errors in the actual election.

Taken in balance with the lack of diligence shown by the Green Party in signature gathering, the Court should deny the TRO and permit the counties to continue with their very complex and time-sensitive work in preparing for the upcoming general election.

c.   Irreparable Injury

Plaintiffs claim that they will suffer irreparable injury if they are not permitted an opportunity to qualify for the ballot by submitting their additional petition signatures. While it is true that the lost opportunity to place a candidate for president on the 2016 ballot cannot be regained if this Court denies the TRO, the nature of the irreparable harm and the actual cause of that harm must be considered.  *Anderson,* 460 U.S. 788-89, 103 S.Ct. at 1569-1570 (when a state election law provision imposes only "reasonable, nondiscriminatory restrictions" upon the First and Fourteenth Amendment rights of

14

voters, "the State's important regulatory interests are generally sufficient to justify" the restrictions); *Burdick,* 504 U.S. at 433-34, 112 S.Ct. at 2063-64.

As discussed above, Plaintiffs offer no evidence showing what efforts they took between March 14, 2016, when they pre-filed their petition for ballot access and May 21, 2016, the date that actually efforts to gather signatures was commenced. There is no suggestion in the declarations of Plaintiffs' witnesses that they posted volunteer requests on their website or other social sites such as Facebook or Craig's List. There is no showing that they considered hiring signature gathers, or if they did, when those efforts were implemented. There is nothing in the record before this Court which demonstrates that Plaintiffs made any good-faith efforts to use the time between March 14 and May 21 to advance their plans to bring a candidate to the Nevada ballot.

On the other hand, Defendant Cegavske provides substantial evidence of the harm that will result to the State if the TRO is granted and the counties are ordered to verify the signatures collected and submitted after the statutory deadline, delaying the ballot preparation and printing processes. Not only financial harm of a significant magnitude, but harm to the State interests identified above, including increased potential for error in the ballots or the actual election process and an assault on the integrity of the ballot by imposing a separate standard for this particular candidate.

d. Advancement of Public Interest

The public interest weighs in favor of the State where the Plaintiffs have not shown that they were actually prevented from qualifying for the ballot solely due to the filing deadlines imposed by NRS 293.1715. With no evidence showing what steps were taken to gather enough signatures to qualify before the deadline, the Court can conclude that none were taken until the last minute, despite the Green Party knowing as early as mid-March that they would be seeking a place on the ballot.

The State has substantial interests at stake here; election integrity and professionalism, federal statutory mandates, citizens interests in rationally applied requirements and clear, concise ballots, with adequate time to review them and study the

Attorney General's Office
100 North Carson Street
Carson City, NV  89701

issues before election day.  Delaying the preparation and printing of the ballots and the necessary testing of those ballots on the election equipment jeopardizes those extreme important and weighty state interests.

IV.  Security Under FRCP 65(c)

Rule 65 of the Federal Rules of Civil Procedure provide that:

> The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained. The United States, its officers, and its agencies are not required to give security.

Fed. R. Civ. P. 65.

Should the Court determine to grant the TRO or Preliminary Injunction sought by the Plaintiffs, Defendant Cegavske asks the Court to require the Plaintiffs to provide adequate security to cover the costs of rush-mode printing that will be required by the delay in verifying the late submitted signatures and to cover any penalty that may be imposed by any court if enforcement proceedings are instituted by the U.S. Attorney General for failure to comply with UOCAVA pursuant to 52 U.S.C. § 20307.  An estimate of the total state cost for printing absentee ballots is $700,000.  Thorley Aff., ¶ 10.  Based on these rough figures, Defendant Cegavske would ask the Court to require Plaintiffs to post a $500,000 security bond in support of the TRO.

V. Conclusion

The Court should deny the Plaintiffs' request for a TRO and for a Preliminary Injunction.  Plaintiffs have little likelihood of success on the merits of their claims given the lack of any evidence of a good-faith effort to meet the reasonable statutory deadlines and given the important, even "weighty" state interests identified above and supported by the reasonable statutory restrictions placed on access to the ballot in Nevada.

Public interests also outweigh the harm to the Plaintiffs where there is no evidence that the Plaintiffs were late-comers to the process or in coming to a decision to run for office.  Evidence suggests that as early as March 14, 2016, when they pre-filed their ballot

Attorney General's Office
100 North Carson Street
Carson City, NV  89701

access petition, Plaintiffs were well-informed of the unique nature of this year's election landscape, that the interest in alternative candidates would be high and that the large field of Republican candidates was dwindling quickly.  Evidence further suggests that, had the petition circulators been more diligent in establishing the eligibility of the persons signing their petitions, the Plaintiffs would have been able to qualify and this court proceeding would have been unnecessary.

Therefore, and based on the preceding as well as the affidavits and exhibits provided herewith, Defendant Cegavske asks that no temporary restraining order or preliminary injunction issue upon this application.  Alternatively, if an order in favor of the Plaintiffs is entered, Defendant Cegavske asked that the Court require security in the amount of $500,000 as set forth in FRCP 65(c).

DATED this 25th day of August, 2016.

ADAM PAUL LAXALT
Attorney General

By:  /s/ Lori M. Story
LORI M. STORY
Senior Deputy Attorney General

Attorney General's Office
100 North Carson Street
Carson City, NV  89701

Attorney General's Office
100 North Carson Street
Carson City, NV  89701

## CERTIFICATE OF SERVICE

I certify that I am an employee of the State of Nevada, Office of the Attorney General, and that on this 25th day of August, 2016, I served a true and correct copy of the foregoing **DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE: PRELIMINARY INJUNCTION**, by electronic filing said document in the U.S. District Court CM/ECF Electronic filing and emailing to:

> TONY NASSER, ESQ.
> BARNES LAW
> 601 SO. FIGUEROA SR., STE 4052
> LOS ANGELES, CALIFORNIA 90017
> tonynasser@ebarneslawllp.com

And by U.S. Mail, a true and correct copy to:

> MACE J. YAMPOLSKY, LTD.
> MACE J. YAMPOLSKY, ESQ.
> 625 SOUTH SIXTH STREET
> LAS VEGAS, NEVADA 89101

> /s/ Sally A. Bullard
> Employee of the Office of Attorney General