Tony Nasser, Esq., CA SBN: 307930
BARNES LAW
601 South Figueroa Street, Suite 4050
Los Angeles, California 90017
Telephone:   (310) 510-6211
Facsimile:   (310) 510-6225

E-mail:   tonynasser@barneslawllp.com

Attorney for Plaintiffs Nevada Green Party, Dr. Jill Stein, and Julia Hammett
Attorney has complied with LR IA 10-2

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| NEVADA GREEN PARTY, DR. JILL STEIN; and DR. JULIA HAMMETT, as Co-Chair of the Nevada Green Pary, <br><br> Plaintiffs, <br><br> v. <br><br> BARBARA K. CEGAVSKE, in her official capacity as Secretary of State of Nevada, <br><br> Defendant. | Case No.: 2:16-cv-01951-JAD-CWH <br><br> **PLAINTIFFS' REPLY TO DEFENDANT'S OPPOSITION TO APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE: PRELIMINARY INJUNCTION** |

## I.   Introduction

The Secretary of State Barbara Cegavske's ("Secretary") *Opposition to Application for Temporary Restraining Order and Order to Show Cause Re: Preliminary Injunction* ("Opposition") raises a number of issues and mischaracterizations that warrant clarification in advance of the hearing on the temporary restraining order, scheduled for August 29, 2016. As expounded below: (1) the stipulation entered into by the Nevada Green Party is unrelated to this current matter; (2) *Fulani v. Lau*, attached hereto as Exhibit A, is factually similar to the matter here and should be relied upon as controlling precedent; (3) the Nevada Green Party was more than diligent in collecting signatures before the June 3, 2016, deadline; (4) any prejudice to the State of Nevada or the Secretary—of which there actually is none—is a fault of the Secretary's, not the Nevada Green Party's; and (5) the Nevada Green Party has more than enough signatures to qualify their presidential nominee. Additionally, no security bond is required in this case because it involves issues of overriding public concern.

## II.   Argument

### A.   The 2014 Stipulation Has No Bearing On This Case

The Secretary seems to think it necessary to drudge up unrelated past litigation initiated by the Nevada Green Party. Opposition 1:26–2:28. Yet, the 2014 civil action, which sought injunctive and declaratory relief regarding Nevada's former statutory requirements for minor party ballot qualification, has no relation to or bearing on this case. In that case, the Nevada legislature amended the applicable law that required minor party qualifying petitions to be filed with the Secretary in May to then require filing the petition to the third Friday in June. Thus, the parties stipulated that "no case or controversy remains in *this* litigation" (emphasis added). Opposition, Ex. 4. However, that stipulation has no impact on this matter before the court today for three reasons. First, the stipulation never mentioned nor is applicable to any future conflict or disagreement. Second, the Nevada Green Party had not been harmed by the new June deadline, and thus had no standing to contest it in court. And, third, if the Nevada Green Party had not stipulated to dismiss the case, the court would have done so because the Party lacked standing as a result of the amended law. Now, plaintiffs bring suit under the new law because the Nevada Green Party,

including its members and potential voters, have been harmed as a result of the arbitrary June 3, 2016, filing deadline and the Secretary's unreasonable refusal to consider any additional signatures.

### B. *Fulani v. Lau* Is Controlling Precedent That Is Nearly On All Fours With This Case

The Secretary also asserts that *Fulani v. Lau*[1] ("*Fulani*") is distinguishable from the matter before the court today. This is false. *Fulani* should be considered controlling precedent for this Court's decision on the temporary restraining order because it is factually similar—indeed, nearly factually identical—and considered all of the same issues before the court today.

First, the relevant comparison is not, as the Secretary characterizes it, between the "65-day period allowed to the county clerks to verify the petition signatures" in *Fulani* to the "only 10 day" period for signature verification that allegedly is in place today. In reality, the Secretary today takes an extra six days than Nevada took in 1992 in *Fulani*. Back in 1992, minor party ballot qualification signatures must have been submitted to the Secretary by June 10, 1992, in order to meet a federal deadline of September 24, 1992. *Fulani,* Ex. A at 2. The State explained that deadline based upon a 65-day requirement to verify the petitions, then additional time to verify the affidavits used to check the petitions, *Fulani,* Ex. A at 12–13. By comparison, today the Secretary requires petitions to be submitted by June 3, 2016, to meet a federal deadline of September 23, 2016. The Secretary explains this deadline based on a 10-day requirement to verify signatures a 91-day requirement to create, translate, proof, print, publish, and test the ballots. Yet, it does not matter whether the deadline is allegedly to verify signatures or to print and proof the ballots, the relevant dates are nearly identical between *Fulani* and the current Nevada statutes.

Second, the rationale considered by the District Court in *Fulani* is very applicable to the facts of this case, as the Nevada Green Party is in nearly an identical position to one of the plaintiffs in *Fulani*, the Fulani Group. *Fulani,* Ex. A at 2. In 1992, the Fulani Group was campaigning for Lenora B. Fulani as an independent candidate for president. *Ibid.* As the Court explains:

> "[t]he campaign submitted its petition on June 10, 1992, but the State rejected the petition because it lack [sic] the requisite number of valid

---

[1] *Fulani v. Lau*, case number CV-N-92-535-ECR, was a case also from the United States Federal Court for the District of Nevada in 1992. A copy of the court's order granting the temporary restraining order from that case is attached to this Reply as Exhibit A. Declaration of Tony Nasser ¶3.

signatures. The campaign then circulated additional petitions and collected additional signatures which it tendered to the State on August 19, 1992, but the State refused to accept the supplement."

*Fulani,* Ex. A at 2.

While the other two plaintiffs in *Fulani* were "newly emerging political movements or parties," *Fulani,* Ex. A at 9, the Court nonetheless applied an entirely independent analysis to the unique circumstances presented by the Fulani Group, *Fulani,* Ex. A at 10. Through that discussion, the court, citing the Supreme Court case of *Anderson v. Celebrezze*, 460 U.S. 780, 790 (1983), noted that laws restricting ballot access "also burden candidates who decide run in advance [sic] but who must enlist volunteers and collect signatures long before the general population has begun to think about election season." *Fulani,* Ex. A at 10. This is not simply a "suggestion" of Plaintiffs in this case, Opposition 7:16–19, but a burden recognized by the Supreme Court of the United States, *See Anderson*, *supra*, 460 U.S. 780.

The Secretary attempts to explain this reasoning away by an extended mischaracterization of the Nevada Green Party's signature collection activities. *See* Opposition 7:3–8:2, 9:23–10:14. The Secretary posits that "[a]rguably, a slightly more sincere effort on the part of this long-standing minor political party could have rustled up significant volunteers to circulate petitions in early rather than the end of May." Opposition 9:27–10:1. However, this is a red-herring and inaccurate. Before the June 3, 2016, deadline, the Nevada Green Party collected over 8,000 signatures in anticipation of meeting a requirement of 5,431. By the very nature of the process, the minor party is unable to know which signatures the Secretary will accept as valid. It is also worth noting here that the signature verification process is fraught with errors, which means that even if the Nevada Green Party went through painstaking detail to ensure that each signature collected was accurate, even then not all signatures would be accepted. *See* Opposition, Ex. 6. Accordingly, it is impossible to know how many signatures must be collected to meet the ballot qualification requirement. Furthermore, even though the 8,000-plus signatures were submitted to the Secretary before June 3, 2016, the Nevada Green Party was not notified that it lacked the required number of valid signatures until June 22, 2016. A mere week later, the party had already filed an appeal

with the Secretary's office and offered nearly 1,000 more signatures for consideration. Yet, despite the Nevada Green Party's diligence in attempting to qualify for the ballot, the Secretary's office took over six weeks before denying the timely appeal on August 12, 2016. Opposition, Ex. 7.

Finally, the Secretary contends that because two other minor parties have qualified for the Nevada ballot this year, the Libertarian and Independent American Party candidates, that plaintiffs here will be unlikely to prevail on the merits of this claim. However, this should also be controlled by *Fulani*, in which three independent or minor party candidates had placed their name on the ballot, yet the court found the deadline unconstitutional. *Fulani*, Ex. A at 9.

Thus, the three points on which the Secretary attempts to distinguish *Fulani* from this case are not dissimilarities at all. The facts of *Fulani* are either identical or less burdensome than what this case entails. Just as the court in *Fulani* granted a temporary restraining order on those facts, this Court should reach the same conclusion.

**C.    The Nevada Green Party Did Not Lack Diligence In Collecting Signatures Before The June 3, 2016, Deadline**

Throughout the Opposition, the Secretary asserts that had the Nevada Green Party been more diligent and started to collect signatures earlier, it would have been able to avoid this whole conflict, and any resulting prejudice from granting this temporary restraining order is solely the fault of the plaintiffs' laziness. Yet, again, this couldn't be further from the truth.

As touched on in Section B, *supra*, plaintiffs collected more than 2,500 signatures *more than* the 5,431 required by the Secretary. It is impossible to know how many of those signatures will be considered to be valid by the Secretary in advance of filing. Moreover, the Secretary's office did not notify the Nevada Green Party that it lacked the required number of signatures until June 22, 2016, to which plaintiffs responded in a mere week appealing the decision and offering nearly 1,000 more signatures for consideration, which more than likely would have made up for the 647 missing signatures.

Moreover, it should be noted that the huge amount of signatures collected in only "two weeks before they were due to be filed," as the Opposition emphasizes, is strong evidence that the Nevada Green Party was very diligent in collecting signatures and there is widespread support for the Nevada Green

- 5 -

PLAINTIFFS' REPLY TO DEFENDANT'S OPPOSITION TO TEMPORARY RESTRAINING ORDER

Party to be on the ballot. To deny this temporary restraining order and prevent the Nevada Green Party from placing Dr. Stein on the ballot as a presidential nominee silences the voices of all of these thousands of voters. Even using the Secretary's number of verified signatures, and ignoring the additional signatures collected since June 22, 2016, over 4,000 voters will have their First Amendment Rights quashed if the Nevada Green Party is forbidden from exercising its right to associate. More than adequate support for the Nevada Green Party's presidential nominee, Dr. Stein, exists.

**D. The Secretary Of State Should Be Estopped From Bemoaning Prejudice As A Result Of This Temporary Restraining Order Because The Secretary Unreasonably Took Over Six Weeks Before Denying The Nevada Green Party's Appeal Under NRS 293.12793, And There Is No Actual Prejudice If This Temporary Restraining Order Is Granted**

The Secretary's entire argument relating to prejudice to the State is based upon increased costs associated with "rush" printing services to meet the federal deadline of September 23, 2016, and the potential of errors on the ballots as a result. Opposition 11:9–13:17. However, unlike the Secretary would like to assert, this is not the fault of the Nevada Green Party, which has been extraordinarily diligent in attempting to meet the State's requirements for ballot qualification and resolve the issues that resulted. The deadline to submit signatures for verification was June 3, 2016; the Nevada Green Party met this deadline. Although the Opposition explains how it took six days to verify the signatures submitted by plaintiffs, Opposition 14:3–5, the Nevada Green Party was not notified that it lacked 647 valid signatures until June 22, 2016. A mere week later, on June 29, 2016, plaintiffs had already timely submitted an appeal to the Secretary and offered nearly 1,000 additional signatures to rectify the insufficiency. Yet, the Secretary inexplicably denied the additional signatures and then took more than six weeks to issue a three and one-half page letter denying the appeal, dated August 12, 2016. Opposition, Ex. 7. A mere four days later, plaintiffs filed the current complaint and request for temporary restraining order as they now had standing to bring suit following the denial of the appeal.

Thus, as the above timeline represents, almost the entirety of any delay in bringing this civil action was caused solely by the Secretary's office. Even if that were not the case, whether a state law passes

PLAINTIFFS' REPLY TO DEFENDANT'S OPPOSITION TO TEMPORARY RESTRAINING ORDER

constitutional muster outweighs mere concerns of financial burden and convenience. *See Fulani*, Ex. A.

To contrast this situation with that in *Fulani*, in *Fulani* the motion for temporary restraining order was filed on September 2, 1992—nearly two months after the filing deadline of June 10, 1992—an opposition was filed on September 21, 1992, the federal deadline in 1992 was September 24, 1992, and the court did not enter the order until October 1, 1992. *Id.* at 1–2. Here, plaintiffs here have filed their pleadings earlier, on August 16, 2016, defendants filed a response earlier, on August 25, 2016, plaintiffs initiated a stipulation to advance the hearing to an earlier date, on August 29, 2016, and the federal deadline is the same, on September 23, 2016. There is less prejudice to the state here than in the circumstances present in *Fulani*, and that court nonetheless ordered a preliminary injunction in that case, explaining that:

> "The Court realizes that the imposition of this injunction will cause the State inconvenience, additional expense and possibly delay the distribution of ballots. These hardships are a price worth paying to protect the First and Fourteenth Amendment rights which are at issue in this case."

*Fulani*, Ex. A at 15.

Furthermore, there is no actual prejudice to the defendant if this Court grants the temporary restraining order on August 29, 2016, four days after the alleged last day to begin printing. The August 25, 2016, printing date that the Opposition describes as the "last date for the Clark County Election Department to provide the mail/absentee ballot files to [the printing company] for normal production mode printing in order to ensure delivery of all mail/absentee ballots to the Election Center by September 16, 2016," gives the State one week before the federal deadline of September 23, 2016. Opposition 12:28–13:1. Yet, the Opposition says the Secretary needs only three days after the last delivery of ballots to finalize the printed ballots for mailing overseas, per the federal requirements. Opposition 13:10–11. Thus, the State has four days of extra time built into its already unnecessarily burdensome schedule that it seems to be overlooking.

Additionally, the assertion that it would require eight days to verify plaintiffs' signatures if a temporary restraining order is granted is unsupported and unreasonable. The Opposition inexplicably

PLAINTIFFS' REPLY TO DEFENDANT'S OPPOSITION TO TEMPORARY RESTRAINING ORDER

states that the Secretary's "system does not allow add on signatures after the verification process has begun." Opposition 14:2–3. This is a nonsensical suggestion. *Arguendo*, if that is the case, it took only six days to verify nearly 8,000 signatures the first time, therefore verification of approximately 1,200 more would take 1/8 of that time. Additionally, plaintiffs are informed and believe that the verification process actually only took four days, and two days were utilized in administrative cleaning up, not substantive verification.

Finally, the Opposition takes the position that the only remaining possibility to expedite processing the ballots to meet the September 23, 2016, deadline is by expediting the printing of the ballots at unreasonable expense. As the preceding discussions indicate, such is not the case. Indeed, the Secretary has a full week, with four days of leeway, following the printing process that is not even considered. One hundred thousand dollars per day in excess printing fees is exorbitant and unreasonable when an available alternative is not even considered.

### E. The Nevada Green Party Has More Than Enough Signatures To Qualify Their Nominee, Dr. Stein

Since being notified of the lack of valid signatures, plaintiffs have collected in excess of 1,200 additional signatures for validation, and counting. These are prepared and ready to be submitted to the Secretary immediately following an order from this Court. Even calculated at the low verification rate offered by the Opposition of 55.9%, plaintiffs will exceed the 647 signatures missing from their earlier petition.

### F. No Security Is Required In This Case Under FRCP 65(c)

"Generally, when granting a preliminary injunction a court must require the moving party to post a security bond." *Fulani*, Ex. A at 16. "However, courts may waive the security requirement when the litigation involves issues of overriding public concern." *Ibid, citing* Wright & Miller § 2954 p.529 (1973). Here, no security bond is required because the issues presented involve issues of overriding public concern. "The survival of strong and vigorous constitutional rights and political freedoms is one of the most important public concerns." *Fulani*, Ex. A at 16.

### III. Conclusion

For the reasons explained in plaintiffs complaint, motion for temporary restraining order, and in the preceding sections, this Court should grant plaintiffs' request for a preliminary injunction and find it unnecessary to post any security bond.

DATED: August 29, 2016

Respectfully submitted,
BARNES LAW

/s/ Tony Nasser
By: Tony Nasser, Esq.
Attorney for Plaintiffs

# CERTIFICATE OF SERVICE

IT IS HEREBY CERTIFIED THAT:

     I, TONY NASSER, am a citizen of the United States and am at least 18 years of age. My business address is 601 South Figueroa Street, Suite 4050, Los Angeles, California 90017.

     I am not a party to the above titled action. I have caused service of this Reply on the following parties by electronically filing the foregoing using the Court's CM/ECF system:

Lori M Story
Office of the Attorney General
555 Wright Way
Carson City, NV 89711
775-684-4605
Fax: 775-684-4601
Email: lstory@ag.nv.gov

Bradley Scott Schrager
Wolf, Rifkin, Shapiro, Schulman & Rabkin
3556 E. Russell Rd
Las Vegas, NV 89120
702-341-5200
Fax: 702-341-5300
Email: bschrager@wrslawyers.com

DATED: August 29, 2016          Respectfully submitted,

                                           /s/ Tony Nasser
                                           Tony Nasser, Esq.
                                           Attorney for Plaintiffs