# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

| | |
|---|---|
| Nevada Green Party; Dr. Jill Stein; Julia Hammett, | **2:16-cv-01951-JAD-CWH** |
| Plaintiffs | **Order Denying Request for Injunctive Relief** |
| v. | |
| Barbara C. Cegavske, in her official capacity as Secretary of State of Nevada, | [ECF No. 3] |
| Defendant | |

Nevada's election laws offer three ways for a minor political party to qualify to place a candidate on the 2016 general-election ballot, including a petition method. Minor parties seeking to qualify for the ballot this year by petition were required to submit 5,431 valid signatures by June 3. In 2014, the petition deadline was April 11, and the Nevada Green Party (NGP) challenged it as unconstitutionally early. The party dismissed that suit last summer after the Nevada legislature extended the deadline to June, stipulating that the amendment had resolved the controversy.

The NGP waited until less than two weeks before the deadline to start collecting signatures to qualify to place candidates on Nevada's 2016 ballot. When the party's June 3 petition came up 647 signatures short after the verification process was completed, the party, its state co-chair Julia Hammett, and the Green Party's presidential candidate Dr. Jill Stein filed this action and moved for a mandatory injunction directing Nevada's Secretary of State to accept and process another 1,000+ signatures. The plaintiffs argue that the Secretary of State has the discretion to accept the supplemental signatures despite the deadline's expiration and, alternatively, that the June 3 deadline unconstitutionally restricts the NGP's access to the ballot and its supporters' associational and free-speech rights. I find that the plaintiffs have not demonstrated that they are entitled to this extraordinary relief, and I deny the motion.

**Background**

**A.    Nevada's ballot-access scheme for minor parties**

There are three ways for a minor political party to place a presidential candidate on Nevada's general-election ballot: (1) have a candidate in the last election who received votes equal to at least 1% of the votes cast in the state's last congressional race; (2) be the party designated on the voter applications of at least 1% of the state's registered voters by January 1st of the general-election year; or (3) file a Minor Political Party Ballot Access Petition with the Nevada Secretary of State at least ten working days before the third Friday in June preceding the general election that contains the signatures of registered voters in an amount equal to at least 1% of the votes cast in the state's last congressional race.[1]  For 2016, this means that a minor political party in Nevada seeking to gain ballot access by petition (option 3) had to submit its collected signatures to the respective county clerks and registrar of voters by June 3 and have at least 5,431 of those signatures verified in order to have the opportunity to place its candidates' names on the ballot for the November 8, 2016, general election.[2]  The statutory scheme places no limit on when a minor party can begin collecting signatures,[3] and a qualifying party does not have to identify its candidates for President and Vice President until the last Tuesday in August.[4]

**B.    The Nevada Green Party's 2014 challenge to the petition deadline**

The signature-submission deadline for minor parties seeking to qualify for Nevada's ballot has not always been in June.  The version of the statute in effect in 2014 required the signatures to be submitted by April 11th.[5]  The NGP[6] challenged the deadline as unconstitutionally early, arguing that

---

[1] NEV. REV. STAT. §§ 293.1715(2)(a)–(c); 293.172(1)(c).

[2] ECF No. 19-1 at 1 (Thorley aff.).

[3] Both parties agreed on this point at oral argument.

[4] NEV. REV. STAT. § 293.1725(4).

[5] NEV. REV. STAT. §§ 293.172(1)(c) (2011), 293.1715(2)(c) (2011) (requiring parties to submit signed petitions by the third Friday in May and to submit signatures for verification no later than 25 working days before that).  Until September 30, 2009, the deadline fell in early July (25 workdays before the second Friday in August).  *See* NEV REV. STAT. §§ 293.1715(2)(c) (2003), 293.172(2)(c)

"[t]he early April deadline and short time period in which to gather signatures limits" its "abilities to qualify for a place on the ballot" in violation of the First and Fourteenth Amendments.[7]  It sought an injunction directing the Secretary of State to accept signatures through the first Tuesday in July in all future election years.[8]  The party dismissed that suit in July 2015 after the Nevada legislature extended the deadline to June, and the NGP stipulated that the amendment left "no case or controversy" remaining.[9]

**C.      The Nevada Green Party's 2016 ballot-access effort**

On March 14, 2016, the NGP pre-filed its petition form, suggesting that it was planning to collect the signatures it needed to qualify to place candidates on Nevada's 2016 general-election ballot.[10]  But it waited more than two months—until less than two weeks before the June 3 deadline—to start collecting those signatures.[11]  The NGP attributes this delay to its inability "to organize and obtain volunteers to collect enough verified signatures earlier and/or soon enough."[12]

On the June 3 deadline, the NGP submitted for verification the 8,554 signatures that it had collected, the vast majority of which were submitted to Clark County.  But nearly 45% of the

_____

(1999).

[6] Along with different individual plaintiffs.

[7] *The Green Party of Nevada et al v. Miller*, 3:14-cv-00210-LRH-WGC, ECF No. 1.  The complaint and the stipulations filed in that case were made a part of this record by the Secretary of State, who was a party to that action.  *See* ECF No. 19-3 at 3 (complaint), 12 (stipulation to stay), 32 (stipulation to dismiss).

[8] ECF No. 19-3 at 9 (complaint in 3:14-cv-00210-LRH-WGC).

[9] *Id*. at 13 (staying the case pending the close of the legislative session because "[a] change in the relevant statutes may resolve the primary issues in [that] case."); *id*. at 33 (stipulating that "[t]his action was stayed . . . in hopes that the legislature would address the petition deadline issue.  The legislature did in fact pass Senate Bill 499. . . .  In view of this enactment, no case or controversy remains in this litigation.").

[10] *Id*. at 36.

[11] ECF No. 3-2, ¶ 5 (Borghese decl.).

[12] ECF No. 1 at 3.

signatures were rejected during the verification process as duplicative, illegible, not matching the voting-record signature, or not belonging to a registered voter, leaving the NGP 647 signatures short.[13]  On June 22, 2016, the Secretary of State notified the party of this deficiency.[14]

The NGP timely contested Clark County's verification results to the Secretary of State under NRS 293.12793, arguing that its shortfall is attributable to errors and inconsistencies during that verification process.[15]  While that appeal was pending, on August 1, 2016, the NGP attempted to submit an additional 1,000 signatures for verification but the state refused them as untimely.[16]  The Green Party held its national convention five days later and selected plaintiff Dr. Jill Stein as its presidential candidate.[17]  On August 12, 2016, the Secretary of State denied the NGP's appeal after concluding that the petition "was properly verified by the Clark County Registrar of Voters in accordance with all applicable laws, regulations, and procedures."[18]

Four days later, plaintiffs filed this action and an application for a temporary restraining order and an order to show cause why a preliminary injunction should not issue.[19]  They ask me to prevent the Secretary of State from refusing to accept the NGP's supplemental signatures and direct her "to take all action necessary to accept" those signatures "and to place the names of its presidential and vice-presidential candidates on all election ballots in all counties of the State of Nevada for the November 8, 2016, general election."[20]  I expedited the briefing schedule,[21] held oral argument on the

---

[13] ECF No. 19-1 at 2 (Thorley Aff.).

[14] *Id.*

[15] ECF No. 19-3 at 39.  Plaintiffs do not raise this argument in this action.

[16] ECF No. 3-2 at 2.

[17] *Id.*

[18] ECF No. 19-3 at 54.

[19] ECF Nos. 1, 3.

[20] ECF No. 13 (proposed order).

[21] ECF No. 5.

motion on August 29, 2016, and took the matter under submission.[22]  Having carefully considered all of the arguments and evidence, I now deny the motion.

**Discussion**

Injunctive relief "is an extraordinary remedy never awarded as of right."[23]  To obtain this remedy, plaintiffs must show (1) that they are likely to succeed on the merits and (2) likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in their favor, and (4) that a preliminary injunction is in the public interest.[24]  Under the sliding-scale approach to preliminary injunctions in this circuit, "the elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another."[25]  But, "at an irreducible minimum," plaintiffs "must demonstrate a fair chance of success on the merits, or questions serious enough to require litigation."[26]

Plaintiffs' motion fails at the merits step.  Even if the final three factors tip in their favor, I cannot conclude from the record before me that plaintiffs have shown that they have a fair chance of success on the merits or questions serious enough to require litigation.

**A.     Plaintiffs have not demonstrated a likelihood of success on the merits of their claim.**

Plaintiffs' lead argument is that the Secretary of State has discretion to accept the party's supplemental signatures and run them through the verification process despite the passage of the June 3 submission deadline.[27]  Alternatively, plaintiffs argue that Nevada's statutory deadlines

---

[22] ECF No. 24 (minutes).  Three Nevada voters moved to intervene in this action for purposes of opposing the motion for injunctive relief.  ECF No. 16.  I heard—and denied—their motion to intervene at the August 29th hearing, but I agreed to consider their proposed opposition, ECF No. 17, in an amicus curiae capacity.  Plaintiffs voiced no objection to this approach.

[23] *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).

[24] *Id.* at 20.

[25] *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1131, 1131 (9th Cir. 2011).

[26] *Pimentel v. Dreyfus*, 670 F.3d 1096, 1111 (9th Cir. 2012) (quoting *Guzman v. Shewry*, 552 F.3d 941, 948 (9th Cir. 2012)) (internal quotation marks omitted).

[27] ECF No. 3 at 9.

1  unconstitutionally burden minor political parties' rights to ballot access and voters' rights to vote for

2  minor party candidates and thus may not be enforced.[28]  Plaintiffs have not demonstrated that either

3  argument is likely to succeed.

4

           **1.**        **The Secretary of State does not have discretion to ignore the signature-**

5                        **submission deadlines.**

6         Plaintiffs cite no authority for their lead argument that the Secretary of State has the

7  discretion to ignore the signature verification and petition deadlines that the Nevada legislature set in

8  NRS Chapter 293; when pressed at oral argument, plaintiffs' counsel could identify none.  Instead

9  they argue that nothing in these statutes "prevents the Secretary of State from accepting additional

10  signatures" past the June 3 deadline.[29]  But the plain language of the statutes belies this claim.

11         Nevada's minor-party ballot-access statutes are teeming with musts.  Section 293.1715

12  provides that the Secretary of State "must" place qualified minor parties' candidates on the ballot.

13  And minor parties "must" timely complete the steps to get qualified: "Not later than the third Friday

14  in June preceding the general election, [the party] *must* file" a petition with the required signatures;[30]

15  and  "[e]ach document of the petition *must* . . . be submitted to the county clerk of that county for

16  verification . . . not later than 10 working days before the last day to file the petition."[31]  Where—as

17  here—the statutory language is unambiguous, its plain meaning controls,[32] and the Nevada Supreme

18

19

20

[28] *Id.* at 8–9.

[29] ECF No. 3 at 9.

[30] NEV. REV. STAT. § 293.1715(2)(c).

[31] NEV. REV. STAT. § 293.172(1)(c).

[32] *Lueck v. Teuton*, 219 P.3d 895, 899 (Nev. 2009).  Plaintiffs have also offered—and I find—nothing to suggest that the Nevada legislature intended the statutory deadlines to be discretionary.  Nor do they provide any authority for the proposition that the legislature could delegate to an executive branch member like the Secretary of State the discretion to, effectively, adopt new rules for minor-party ballot access.  *See* NEV. REV. STAT. Const. Art. 4, § 27 (vesting power to regulate elections in the Nevada legislature).

Court has recognized that "[t]he word 'must' generally imposes a mandatory requirement."[33]  Courts enforcing deadlines in other states' election statutes have also held that filing deadlines are mandatory, and election officials lack the discretion to excuse their violations.[34]  Plaintiffs have not shown that Nevada's minor-party election rules merit a different interpretation.

     **2.**     **Nevada's minor-party ballot-access scheme is not unconstitutionally burdensome.**

          ***a.***     ***The level of scrutiny depends on the severity of the burden on the plaintiffs' rights.***

Although "voting is of the most fundamental significance under our constitutional structure,"[35] the United States Supreme Court has consistently recognized that states retain the power to regulate their own elections.[36]  Thus, not all voting regulations are subject to strict scrutiny, and "the mere fact that a [s]tate's system 'creates barriers . . . tending to limit the field of candidates from which voters might choose . . . does not itself compel close scrutiny.'"[37]

Recognizing that challenges to a state's election laws cannot be resolved by any "litmus-

---

[33] *Washoe Cty v. Otto*, 282 P.3d 719, 725 (Nev. 2012); *In re Nevada State Eng'r Ruling No. 5823*, 277 P.3d 449, 454 (Nev. 2012) ("'Must' is mandatory, as distinguished from the permissive 'may.'").

[34] *State v. Jeffrey*, 170 P.3d 226, 234 (Alaska 2007) (stating that "it is well established, both in Alaska and in other jurisdictions, that election law filing deadlines are to be strictly enforced") (internal quotations and citations omitted); *Reform Party of Ala. v. Bennett*, 18 F.Supp.2d 1342, 1355 (M.D. Ala. 1998) ("The Secretary of State simply cannot 'administratively' amend or revoke a statue enacted by the Legislature."); *Vandross v. Ellisor*, 347 F.Supp. 197, 207 (D.S.C. 1972) (stating that statutes that "regulate the time for filing a declaration of candidacy are almost universally held to be mandatory; and a declaration that is filed too late is a nullity") (citing 29 C.J.S. Elections § 114 at 286; 25 Am.Jur.2d Elections § 140 at 831); *see also Lueck*, 219 P.3d at 904 (Gibbons, J., concurring in part and dissenting in part) (interpreting Nevada's judicial-election statute and noting that the statutory deadline for declaring candidacy "is not simply a dispensable inconvenience.").

[35] *Illinois Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 184 (1979).

[36] *Burdick v. Takushi*, 504 U.S. 428, 433 (1992); *Storer v. Brown*, 415 U.S. 724, 730 (1974) ("[A]s a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic process.").

[37] *Burdick*, 504 U.S. at 433 (quoting *Bullock v. Carter*, 405 U.S. 134, 143 (1972)).

1  paper test," the Supreme Court provided the proper analytical framework in *Anderson v.*

2  *Celebrezze*:[38]

3

4  > A court considering a challenge to a state election law must weigh "the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to

5  > vindicate" against "the precise interests put forward by the State as justifications for the burden imposed by its rule," taking into

6  > consideration "the extent to which those interests make it necessary to burden the plaintiff's rights."[39]

7

8  In short, the level of scrutiny the court must apply depends on the severity of the burden.  If the

9  burden on plaintiffs' rights is "severe," courts apply strict scrutiny.[40]  But if the election laws impose

10  only "reasonable, non-discriminatory restrictions" on these rights, "the [s]tate's important regulatory

11  interests are generally sufficient to justify" the restriction.[41]

12  ### *b.   The burden on plaintiffs' rights is not severe.*

13  The first step in evaluating plaintiffs' constitutionality challenge under the *Anderson*

14  framework is to assess the degree to which Nevada's minor-party ballot-access laws burden the

15  plaintiffs' rights.  In the Ninth Circuit, we measure that burden by whether, in light of the entire

16  statutory scheme regulating ballot access, "'reasonably diligent' minor party candidates can normally

17  gain a place on the ballot" or "instead they only rarely will succeed" in doing so.[42]  The initial

18  obligation is on the plaintiffs to show that the state's "ballot access requirements seriously restrict the

19  availability of political opportunity."[43]

20  Supreme Court and Ninth Circuit precedent provide helpful guideposts for measuring the

21

22  [38] *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983).

23  [39] *Burdick*, 504 U.S. at 434 (quoting *Anderson*, 460 U.S. at 789).

24  [40] *Id.* (citing *Norman v. Reed*, 502 U.S. 279, 289 (1992)).

25  [41] *Anderson*, 460 U.S. at 788.

26

27  [42] *Libertarian Party of Wash. v. Munro*, 31 F.3d 759, 761–62 (9th Cir. 1994) (quoting *Storer*, 415 U.S. at 742).

28  [43] *Id*. at 762.

burden imposed by Nevada's minor-party ballot-access laws.  In *Anderson,* the United States

Supreme Court struck down Ohio's election law requiring minor-party candidates to submit 5,000

signatures by March 20.  Anderson had been denied a place on the ballot despite supplying almost

triple the required signatures and all other required documentation by the middle of May.[44]  The

*Anderson* court found that the March 20 deadline placed a significant burden on independent-minded

voters and independent-party candidates.  The Court reasoned that this deadline prevented

independent candidates from emerging after mid-March in response to major-party candidate

developments.  It reasoned that the deadline also "burden[ed] the signature-gathering efforts of

independents who decide[ed] to run in time to meet the deadline" because they would be forced to

gather signatures at a time when voter interest would be low.[45]  The Court concluded that "the

'extent and nature' of the burdens the Ohio law placed on the voters' freedom of choice and freedom

of association, in an election of nationwide importance, unquestionably outweigh[ed] the State's

minimal interest in imposing a March deadline."[46]

Just over a decade later, the Ninth Circuit panel in *Libertarian Party of Washington v. Munro*

upheld  a Washington State election law requiring minor-party candidates for statewide offices to

announce a month before major-party candidates and to submit 200 signatures 30 days before the

major-party deadline and 75 days before the general election.  The panel distinguished *Anderson*,

reasoning that "the difficulty of obtaining 5,000 signatures in the dead of winter in Ohio, five months

before major party nominating conventions and eight months before the general election, is readily

apparent.  The Libertarians' task . . . pales by comparison."[47]  The *Munro* panel also noted that,

unlike Anderson himself, who was denied a place on the Ohio ballot, the Libertarian candidate

plaintiffs had no difficulty obtaining the required signatures in time.[48]

---

[44] *Anderson*, 460 U.S. at 806.

[45] *Id.* at 790–91.

[46] *Id.* at 806.

[47] *Libertarian Party of Wash.*, 31 F.3d at 762.

[48] *Id.* at 762–63.

1        But four years later in *Nader v. Brewer*, the Ninth Circuit held that Arizona's law requiring

2 nomination petitions for independent candidates to be filed 90 days before the primary election

3 (approximately 146 days before the general election) was unconstitutional.[49]  The court focused on

4 the fact that, since Arizona had adopted this filing deadline fifteen years earlier, no independent

5 presidential candidate had appeared on Arizona's ballot.[50]  For the *Nader* panel, this historical

6 evidence was the proof in the pudding that the challenged scheme imposed a severe burden on the

7 plaintiffs' rights, triggering strict scrutiny.[51]  And it concluded that the state failed to show that its

8 June deadline was narrowly tailored to meet compelling administrative needs.[52]

9        Unlike in *Anderson* and *Nader*, plaintiffs have not demonstrated that Nevada's election

10 scheme—requiring minor party candidates to gather signatures equal to 1% of the votes cast in the

11 last general election by June 3, 2016—severely burdens their associational, free speech, or ballot-

12 access rights.  It is true that the deadline invalidated in *Nader* fell approximately 13 days after the

13 current Nevada deadline.[53]  But unlike in *Nader*—where no minor party candidate had qualified for

14 the ballot in 15 years—minor political parties have regularly and consistently achieved ballot access

15 under Nevada's scheme.  The Libertarian Party and the Independent American Party both have

16 presidential candidates on Nevada's 2016 general-election ballot,[54] just like they did in 2012 when

17 the deadline fell in early April.[55]  And Green Party presidential candidates made it on Nevada's

18

19

20 [49] *Nader v. Brewer*, 531 F.3d 1028 (9th Cir. 2008).

21 [50] *Nader*, 531 F.3d at 1038.

22
23 [51] *Id*. at 1039.

24 [52] *Id.* at 1040.  The only explanation Arizona offered for the June deadline was that the ballot paper had to be ordered about five months before the election.  *Id.* at 1033.

25 [53] *Id*. at 1031.

26
27 [54] ECF No. 19-1 at 3, ¶ 8.  The state represented at oral argument that these parties qualified via the procedures set forth in NEV. REV. STAT. § 293.1715(2)(a) or (b), not by the petition method.

28 [55] http://nvsos.gov/index.aspx?page=1075, last visited 9/1/16.

1    general-election ballot in 1996, 2000, 2004, and 2008.[56]  This historical evidence demonstrates that

2    "reasonably diligent candidates" have often achieved—and thus can gain—a place on Nevada's

3    general-election ballot under Nevada's minor-political-party ballot-access laws.[57]

4            The NGP's failure to qualify for the ballot this year does not detract from this conclusion.

5    The record strongly indicates that the NGP was not diligent in its signature-gathering effort.  It did

6    not begin to collect signatures until less than two weeks before the deadline, despite having filed its

7    petition form in mid-March[58] and despite the fact that Nevada's scheme places no limit on how early

8    a party may begin collecting signatures.[59]

9            Plaintiffs' argument that the current deadline is unconstitutional is also strongly undermined

10   by the NGP's stipulation to dismiss its nearly identical 2014 challenge based on the Nevada

11   legislature's adoption of this June 3 deadline—an amendment that the NGP *stipulated* had resolved

12   its constitutional concerns just 13 months ago.  This recent history suggests that the NGP perceived

13   the June 3 deadline to be a perfectly manageable one until it needed an excuse for its own delay in

14   meeting it.

15           Differences in the political climate and general voter-interest levels also distinguish this case

16   from *Anderson*.  The *Anderson* court voiced concern that the March deadline did not allow minor-

17   party candidates enough time to decide whether they would run or to drum up the necessary support

18   before the major-party candidates clarified their positions and voter interest was piqued.  But public

19   interest in the November 2016 presidential election has been piqued since long before the NGP

20   started gathering its signatures.  The Republican Party's primary debates were being televised as

21

22

_____

23   [56] Neither party was able to identify which of the three methods in NRS 293.1715(2) the NGP used

24   to achieve ballot access for its national-office contenders in Nevada for these previous general
     elections.

25   [57] *Libertarian Party of Wash.*, 31 F.3d at 761–62.

26   [58] ECF No. 1 at 3.

27

28   [59] *See Mandel v. Bradley*, 432 U.S. 173, 178 (1977) (noting as significant to the burden analysis the
     absence of a time limit on when signature collection may begin).

early as August 2015,[60] and the Democratic Party held a televised debate right here in Las Vegas, Nevada, in October 2015.[61]  The Nevada caucuses were held at the end of February of this year,[62] more than three months before the signature-verification deadline.  Donald Trump was declared the presumptive Republican Party nominee a month before the deadline,[63] and the deadline also fell just three days after Hillary Clinton became the presumptive Democratic Party nominee[64] and only eleven days before Nevada's primary election.[65]  So none of the public-apathy concerns that troubled the *Anderson* Court are present here.

Finally, the number of signatures that Nevada requires and the restrictions on who may provide them are relatively low.  While some states require a small percentage of the state's total registered voters to sign nominating petitions, Nevada requires signatures equal to only 1% of the votes cast in the last general election.[66]  This year, that requirement was particularly light because the 2014 general election was a mid-term election with a record-low voter turnout,[67] so only 5,431 signatures were required.  The limits on who can sign are also minimal.  Signers need only be registered to vote in the county where the signature is submitted, and they may sign the NGP's petition regardless of which party they are registered as or whether they have already signed another

---

[60] https://www.washingtonpost.com/news/post-politics/wp/2015/08/06/annotated-transcript-the-aug-6-gop-debate/, last visited 9/1/16.

[61] https://www.washingtonpost.com/news/the-fix/wp/2015/10/13/the-oct-13-democratic-debate-who-said-what-and-what-it-means/, last visited 9/1/16.

[62] http://www.clarkcountynv.gov/election/Pages/Caucus.aspx, last visited 9/1/16.

[63] http://www.cnn.com/2016/05/03/politics/indiana-primary-highlights/, last visited 9/1/16.

[64] http://www.nytimes.com/2016/06/07/us/politics/hillary-clinton-presidential-race.html?_r=0 (Amy Chozick & Patrick Healy), last visited 9/1/16.

[65] https://nvsos.gov/index.aspx?page=1531 (election calendar), last visited 9/1/16.

[66] *Jenness v. Fortson*, 403 U.S. 431, 438 (1971) (upholding 5% of total eligible voters signature requirement).

[67] http://www.lasvegasnow.com/news/nevada-voter-turnout-of-455-percent-a-new-low, last visited 9/1/16; http://www.nytimes.com/2014/11/12/opinion/the-worst-voter-turnout-in-72-years.html?_r=0, last visited 9/1/16.

1    minor party's petition.

2          Again, the test is whether, considering Nevada's election scheme as a whole, reasonably

3    diligent minor-party candidates could be expected to make it on Nevada's ballot.[68]  I find that the

4    early June deadline[69]—when considered in light of Nevada's statutory framework as a whole

5    (including the relatively low number of signatures required, the minimal restrictions on who may

6    provide them, the lack of restrictions on when a party may begin to collect them, and the two

7    additional ways for minor-party candidates to qualify for the ballot) and the historical success of

8    minor-party candidates in making it on the Nevada ballot—is not severely burdensome and that a

9    reasonably diligent candidate could be expected to achieve ballot access.

10

11          *c.     **The state has set forth legitimate regulatory interests, and the restrictions on
             plaintiffs' rights are reasonably necessary for achieving them.**

12          A state may justify election regulations that impose less than severe burdens "by

13    demonstrating the state has 'important regulatory interests.'"[70]  The Secretary of State identifies three

14    interests to justify this restriction on plaintiffs' rights: (1) maintaining the integrity of the ballot; (2)

15    avoiding voter confusion by requiring a showing of significant voter interest in the candidates it

16    places on the ballot; and (3) preventing unreasonable expenditures in conducting elections and

17    ensuring compliance with federal deadlines.[71]

18          States have a less important interest in regulating presidential elections than state-wide or

19    local elections because the outcome of the former will be largely determined by voters in other

20    states.[72]  Nevertheless, the Supreme Court has consistently held that states have a legitimate interest

21

22    _____

23    [68] *Libertarian Party of Wash.*, 31 F.3d at 761–62.

24    [69] Additionally, plaintiffs' counsel conceded at oral argument that Nevada's deadline is not the
      earliest in the nation.

25
26    [70] *Arizona Libertarian Party v. Reagan*, 798 F.3d 723, 730 (9th Cir. 2015) (quoting *Nader v. Cronin*,
      620 F.3d 1214, 1217 (9th Cir. 2010)).

27    [71] ECF No. 19 at 8.

28    [72] *Anderson*, 460 U.S. at 795.

in regulating the number of candidates on the ballot and has "establish[ed] with unmistakable clarity that States have an 'undoubted right to require candidates to make a preliminary showing of substantial support in order to qualify for a place on the ballot.'"[73]  States also have a legitimate interest in conducting elections in a manner that does not impose excessive or unnecessary expenditures and in complying with mandatory federal election deadlines.[74]

The Secretary of State has demonstrated that closing the door to minor-party petitions on June 3 promotes these important regulatory interests by building in sufficient time in the busy election-activity calendar to complete all the necessary steps to ensuring a smooth and timely general-election process.  Although the general election will not take place until November 8, 2016, there are many benchmarks that must be reached before that day.  As Clark County's Registrar of Voters Joseph Gloria explains in his affidavit, federal law (the Uniformed and Overseas Citizens Absentee Voting Act (UOCAVA)) requires states to print and mail ballots to military service members, their eligible family members, and certain other overseas citizens by September 24, 2016.[75]  Before that, the ballots must be designed, edited, and proofread, and then printed by the only printing company in Nevada that is certified to print and mail absentee ballots.[76]  For those ballots to go out on time, they must be delivered to the printer by August 30, 2016.[77]

The ballot-qualification process must be completed before that date.  Enough time must be built into that process to allow each county a reasonable amount of time to verify and count petition

---

[73] *Munro v. Socialist Workers Party*, 479 U.S. 189, 194 (1986) (quoting *Anderson*, 460 U.S. at 788–89); *see also Bullock v. Carter*, 405 U.S. 134, 145 (1972); *Jenness*, 403 U.S. at 442.

[74] *See, e.g., Reagan*, 798 F.3d at 733.

[75] ECF No. 19-2 at 1–2, ¶¶ 2–6 (Gloria aff.).

[76] *Id*. at ¶ 5.

[77] Although Gloria's affidavit states that August 25th is the deadline, counsel for the State conceded at oral argument that minor parties who have qualified for the ballot have until August 29, 2016, under NRS 293.1725(4) to submit their candidates' names, so the earliest date the ballots can be submitted would more likely be August 30, 2016.

signatures, and the statute only allots 10 working days for that process.[78]  There must be time after that process is completed for a party to prepare and submit an appeal should a petition be rejected for insufficient signatures, plus time for the Secretary of State to review and adjudicate that appeal—a decision that may only be challenged in Nevada's First Judicial District Court.[79]

In this case, the appeal process did not finish until August 12, 2016—just over two weeks before the State's deadline to submit the final version of the ballot for printing to comply with the UOCAVA.  Although it is conceivable that all petition appeals could be resolved in advance of the printing deadline if the deadline to file the petition were later, the state is not required to cut it any closer.  "When a challenged rule imposes only limited burdens on the right to vote, there is no requirement that the rule is the only or the best way to further the proffered interests."[80]  And any choice of filing deadlines is, to some degree, "inherently arbitrary."[81]  But on these facts, the state has set forth legitimate, regulatory interests to justify the June 3 deadline and shown that these restrictions are sufficiently necessary for achieving those interests.  I find nothing in this statutory scheme that unconstitutionally abridges the rights of free speech, association, or ballot access secured by the First and Fourteenth Amendments.

### d.   *Fulani v. Lau* **is neither controlling nor persuasive.**

Plaintiffs rely almost exclusively on an unpublished 1992 order from this district in *Fulani v. Lau* to argue that the June deadline is unconstitutional.[82]  In *Fulani*, the late District Judge Edward Reed ordered the state to accept supplemental signatures from minor political parties and an independent candidate after their petitions for ballot access were rejected for insufficient valid signatures and the submission deadlines had passed.  At that time, Nevada's ballot-access scheme

---

[78] ECF No. 19-2 at 3–4, ¶ 10 (Gloria aff.).

[79] *See* NEV REV. STAT. § 293.174.

[80] *Reagan*, 798 F.3d at 732 (quoting *Dudum v. Arntz*, 640 F.3d 1098, 1114 (9th Cir. 2011)).

[81] *United States v. Locke*, 471 U.S. 84, 94 (1985).

[82] *See* ECF No. 23-2.  Due to the age of this 1992 case, Judge Reed's order is no longer available in the court's archives or on Westlaw.

1   required signatures equal to 3% of the votes cast in the preceding congressional election (9,392

2   signatures) by June 10, 1992, and gave the state 65 days to verify the signatures.[83]   Judge Reed found

3   that the deadline "burden[ed] the rights of nonmajor parties['] candidates by excluding late forming

4   parties and forcing candidates to circulate petitions before most of the voting population has thought

5   about the elections," that the 3% requirement made "the early filing deadline additionally

6   burdensome," and that the state did not need a full 65 days to process the signatures.

7           Though plaintiffs characterize Judge Reed's order as "controlling precedent," it is persuasive

8   only, and the myriad material differences between *Fulani* and this case obviate its persuasive value

9   here.  Unlike the minor parties in *Fulani* that had both been founded less than three months before

10  the filing deadline, the Green Party is a 32-year old organization, founded in 1984.[84]   It succeeded in

11  placing its candidates on Nevada's ballot for the four consecutive general elections in 1996, 2000,

12  2004, and 2008.  There was nothing preventing the NGP from starting to collect signatures well in

13  advance of the June deadline, especially given that it pre-filed its petition form back in March, was

14  well aware of the deadline as demonstrated by its 2014 lawsuit, and has a rich history of ballot access

15  in Nevada.  And no one can seriously claim that "most of the voting population" had not yet begun to

16  think about this election before the NGP started gathering signatures on May 21, considering how

17  early this campaign season started and how ceaselessly the voting public has been inundated with

18  news of it.[85]

19          *Fulani* is further distinguishable because the statute contained markedly different

20  requirements in 1992 than it does today.  Although the deadline condemned in *Fulani* fell a week

21  later than the current June 3 deadline, the signature requirement in 1992 was three times as onerous

22  (3% compared with the current 1% requirement) as it is today.  And the 65-day window that the state

23  had to verify signatures, which Judge Reed characterized as "an excessively long period of time," has

24

25  [83] *Id*. at 3.

26  [84] http://www.gp.org/history, last visited 9/1/16.

27
28  [85] http://www.npr.org/2016/07/03/484214413/the-most-unprecedented-election-ever-65-ways-it-has-been, last visited 9/1/16.

1   been shaved down to 10 working days.

2          I am more persuaded by Judge Stafford's ruling in *U.S. Taxpayers Party of Florida v.*

3   *Smith*,[86] rejecting a newly formed, minor political party's constitutional challenge to Florida's

4   signature deadline after it missed the July 15th deadline for 60,312 signatures to get its presidential

5   and vice presidential candidates on the ballot and the July 6th deadline to file 5,625 petition

6   signatures for its congressional candidate.  The judge reasoned that "[n]othing prevented" the party

7   "from immediately starting to collect" the signatures after it was formed on March 12th.[87]  And he

8   was unsympathetic to the party's claim that it could have gathered all the signatures if the deadline

9   were extended by just 30 days, retorting:

10                  Logically, then, had plaintiffs started collecting signatures thirty days
                    earlier—in early April instead of early May—they would have been
11                  well able to meet the July 15 deadline.  The court finds that a
                    reasonably diligent minor party—even one who waited until early
12                  March in an election year to form a political party—could have
                    gathered the required number of signatures by July 15, thereby
13                  ensuring its presidential and vice presidential candidates' place on the
                    November ballot.[88]

14

15          The same can be said of the NGP.  Plaintiffs claim that they are now ready—nearly two

16   months after the June 3 deadline—to submit enough verifiable signatures to meet the 1%

17   requirement for qualification.[89]  So logic dictates that, had they only started their efforts earlier or not

18   waited until the last day to submit their signatures, they would have been able to supply enough valid

19   signatures by the June 3 deadline.  That, I believe, is what a reasonably diligent minor party

20   would—and should—have done.[90]

21   _____

22   [86] *U.S. Taxpayers Party of Florida v. Smith*, 871 F. Supp. 426 (N.D. Fla. 1993), aff'd 51 F.3d 241
23   (11th Cir. 1995).

     [87] *Id.* at 433.
24
     [88] *Id.*
25
26   [89] ECF No. 23 at 8.

27   [90] *See American Party of Texas v. White*, 415 U.S. 767, 787 (1974) (rejecting notion that a 55-day
28   statutory window for collecting 22,000 petition signatures was unconstitutionally short, reasoning,
     "we are . . . unimpressed with arguments that" these burdens "are too onerous").

1

**Conclusion**

2        Because plaintiffs failed to carry their burden to show a likelihood of success on the merits of

3 their claim or that their claim raises questions serious enough to require litigation, I need not—and

4 do not—reach the remaining factors.  Accordingly, IT IS HEREBY ORDERED that **Plaintiffs'**

5 **Application for Temporary Restraining Order and Order to Show Cause re: Preliminary**

6 **Injunction [ECF No. 3] is DENIED.**

7        Dated this 1st day of September, 2016

8

9                                  _____
                                 Jennifer A. Dorsey

10                               United States District Judge

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28